## CITY OF LOUISVILLE et al. v. LOUISVILLE HOME TELEPHONE CO.

(Circuit Court of Appeals, Sixth Circuit. April 15, 1922.)

No. 3624.

1. **Telegraphs and telephones ⬛⬛33(1)—Compensatory rates must be allowed.**

Though a city, unless restrained by statute, can eject a utility corporation from the streets after the expiration of its franchise, it must allow compensatory rates, so long as it requires the corporation to continue to give public service.

2. **Telegraphs and telephones ⬛⬛33(1)—In absence of statute, municipality can require specified rates on expiration of franchise.**

In the absence of a statute to the contrary, a city may, after the expiration of the franchise of a public utility, by ordinance require the utility to choose between continuing to render service at the rates specified in the ordinance or vacating the streets.

3. **Telegraphs and telephones ⬛⬛33(1)—Under Kentucky statute, company cannot be compelled to accept confiscatory rates on expiration of franchise.**

Ky. St. § 3037d, makes it the duty of a city to offer for sale a suitable new franchise before the expiration of a telephone company's franchise, and deprives it of the right arbitrarily to eject the company from the streets on the expiration of the franchise, so that the company cannot be compelled to accept confiscatory rates as a condition for being allowed to continue its business.

4. **Telegraphs and telephones ⬛⬛7—Kentucky statute, requiring sale of new franchise, valid.**

Const. Ky. § 163, providing that no public service company shall use city streets without the consent of the council, prevents the Legislature from compelling the council to permit a new or additional use of the city streets, but does not prevent it from prohibiting the council from practically destroying the value of property dedicated to public use after it has consented to the occupation of the streets for such purpose, so that Ky. St. § 3037d, requiring the council to offer a new franchise for sale before expiration of the old franchise, is valid.

---

⬛⬛For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. **Constitutional law** ⊜⟹48—**Statute not declared invalid, if conclusion can be avoided.**

A statute should not be found unconstitutional, unless such conclusion cannot be avoided, especially when federal courts are considering a state statute.

6. **Telegraphs and telephones** ⊜⟹7—**Right to renewal of franchise held not lost by delay.**

Where a telephone company called the attention of a city to requirements of Ky. St. § 3037d, requiring the sale of a new franchise, but the city took no action thereunder, because it desired to secure a merger of that telephone company with another company, the city cannot, after the expiration of the company's franchise, claim that the company had lost its rights to the protection given by that statute, because it did not insist on such rights in time.

7. **Telegraphs and telephones** ⊜⟹33(1)—**Injunction against enforcement of rates made conditional on company's proceedings to renew franchise.**

Though Ky. St. § 3037d, places on the city the duty to initiate proceedings for the sale of a new franchise before the expiration of a public utility's franchise, a court of equity will not permit an intolerable impassé between the city and the company, but will make its preliminary injunction against the enforcement of an ordinance establishing confiscatory rates conditional on the company taking proper steps to secure the sale of a new franchise under the statute.

8. **Appeal and error** ⊜⟹1043(5)—**Amendable informality of bill on question indirectly involved held not to require reversal of decree.**

The fact that a bill to enjoin enforcement of a confiscatory rate ordinance did not allege the corporation's willingness to buy a new franchise on fair terms is not of controlling importance in determining the propriety of the preliminary injunction, since the question arises only indirectly, and the defects in the bill can be cured by amendment.

9. **Courts** ⊜⟹371(1)—**Federal court has same jurisdiction as state court in rate cases.**

The machinery of a federal court of equity is as ample and as appropriate as that of a state court in directing and supervising compliance with the state statute requiring sale of a new franchise, where the federal court has jurisdiction by diversity of citizenship, and to prohibit the enforcement of a confiscatory rate ordinance pending the issuance of a new franchise.

10. **Appeal and error** ⊜⟹954(1)—**Ruling on preliminary injunction within range of trial court's discretion will be sustained.**

On appeal from an order granting a preliminary injunction, the question of its issuance will not be examined as if the original application had been made to the appellate court's discretion, but the action of the trial court will be affirmed, if it seems to have been fairly within the range of its discretion.

11. **Injunction** ⊜⟹136(1)—**Equities will be balanced in determining right to preliminary injunction.**

The trial court will balance the conflicting equities of the parties on an application for a preliminary injunction, and, if it appears reasonably probable that the plaintiff may prevail on the final hearing, will temporarily preserve its supposed right against destruction, if that temporary maintenance can be accomplished without danger of greater harm to defendant than there will be benefit to plaintiff.

12. **Telegraphs and telephones** ⊜⟹33(1)—**Trial period of rates held unnecessary before injunction.**

Where the ordinance complained of granted some increase in rates of a telephone company, the natural tendency of which would be to lessen the number of subscribers, and the rates so fixed would be confiscatory

⊜⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

when applied to the volume of business done by the company the year preceding, it was unnecessary to give a period for trial under the ordinance before temporarily enjoining its enforcement, as is necessary in case of a reduction of rates which may increase the business, and especially since telephone subscribers can be more effectively protected against loss if the rates are subsequently found to be valid than can the patrons of a railroad or of a gas company.

13. **Injunction** ⊂⊃137(4)—**Preliminary injunction may be issued, without requiring convincing proof of facts showing unconstitutionality of ordinance.**

Even though an injunction against the enforcement of a rate ordinance is, in effect, a determination that the law of the state is unconstitutional, a preliminary injunction to restrain such rates may be issued, without requiring the same degree of demonstration which would be required at a final hearing, since the unconstitutionality depends on a disputed question of fact, and not on a proposition of law.

14. **Telegraphs and telephones** ⊂⊃33(1)—**Rates shown to be insufficient.**

Evidence that the probable net income of a telephone company under the rates fixed by ordinance would yield a return of only 1 per cent. is sufficient to justify a preliminary injunction against enforcement of the ordinance, since, even if the company's estimates of value and depreciation be greatly reduced, the probable return will still be insufficient to compensate.

15. **Telegraphs and telephones** ⊂⊃7—**Fairness of franchise a judicial question.**

Where the court requires compliance by the city with Ky. St. § 3037d, as a condition to dissolution of a temporary injunction against enforcement of a rate ordinance, the question whether the new franchise offered the utility by the city is fair, as required by that statute, is a judicial question for the trial court to determine.

16. **Telegraphs and telephones** ⊂⊃7—**Renewal of franchise need not be offered for maximum term.**

A city need not, in order to comply with Ky. St. § 3037d, requiring the offer of a new franchise before the expiration of an existing franchise, offer a new franchise for the maximum term permitted by statute, in view of the probability that costs would be materially reduced before the expiration of such term, but will be permitted to offer a franchise for a period of three years, at the expiration of which time it must again offer a new franchise, fair under the conditions then existing.

17. **Telegraphs and telephones** ⊂⊃7—**Franchise requiring periodical readjustment of rates sufficient compliance with Kentucky statute.**

The offer of a new franchise to a telephone company, which would provide for a readjustment of the rates at five-year periods during the existence of the franchise, would be a compliance with the requirements of Ky. St. § 3037d, that the city offer a franchise fair to the corporation, the city, and the consumers.

18. **Telegraphs and telephones** ⊂⊃33(1)—**Confiscatory rates ground for injunction.**

The court will not undertake to require a city council to enact an ordinance offering for sale a new franchise, as required by Ky. St. § 3037d; but if the company announces a willingness to accept such a franchise, and the city refuses to offer it, the city will then be restrained from excluding the corporation from the streets for refusal to serve the public at confiscatory rates specified by the city.

19. **Telegraphs and telephones** ⊂⊃33(1)—**Court cannot enjoin interference by city with rate prescribed by telephone company.**

Where the rates for telephone service fixed by a city ordinance were confiscatory, the court cannot grant a preliminary injunction, prohibiting the city from interfering with the collection by the corporation of rates established by the corporation, which would be a judicial fixing of rates.

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

20. Equity ⊜65(2)—Telephone company cannot ask injunction against rate ordinance, unless it comes into court with clean hands.

Though a court cannot in terms prescribe the rates which may be charged by a corporation after confiscatory rates established by ordinance are enjoined, it can in effect accomplish the same result by refusing its aid to a company which, after the issuance of such injunction, undertakes to collect an exorbitant rate, so that it would not come into equity with clean hands.

21. Appeal and error ⊜1145—Affirmance of temporary injunction in rate case held not to prevent revision by trial court.

The affirmance on appeal of a preliminary injunction issued to restrain the enforcement of a rate ordinance does not deprive the trial court of liberty to revise its conclusion at any time on a showing of reduced figures of cost and operation, or to refuse to continue the injunction in aid of any rate higher than may be reasonable.

22. Telegraphs and telephones ⊜33(1)—Injunction against rates should be conditioned on sworn monthly statements of net income.

An injunction temporarily restraining the enforcement of a telephone rate ordinance should require as a condition that the company file each month a sworn statement showing with reasonable detail its operating income and operating expense incurred during the previous month.

Appeal from the District Court of the United States for the Western District of Kentucky; Walter Evans, Judge.

Suit in equity by the Louisville Home Telephone Company against the City of Louisville and others. From an order granting a preliminary injunction, defendants appeal. Case remanded for the entry of an order modified as directed.

Joseph S. Lawton and M. H. Thatcher, both of Louisville, Ky. (Wm. T. Baskett and Davis W. Edwards, both of Louisville, Ky., on the brief), for appellants.

Helm Bruce, of Louisville, Ky. (Peter, Tabb & Levi, of Louisville, Ky., Galvin & Galvin, of Cincinnati, Ohio, and Bruce & Bullitt, of Louisville, Ky., on the brief), for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. The Telephone Company (called hereafter the company or the Home Company) filed a bill alleging in substance that the city had passed an ordinance fixing the telephone charges at a confiscatory rate, and moved for a preliminary injunction. This was granted, and the city brings this appeal.

[1] The company has carried on its business in Louisville for 20 years under a franchise which fixed the rates, and the term of which expired March 7, 1921. The city council, on May 26, 1921, passed a rate ordinance which by its terms was to continue for one year only, within which period it was assumed that some permanent disposition might be made. It is the rates fixed by this temporary ordinance which were said to be confiscatory. It is now the settled rule, where a rate fixing public service franchise has expired, and where there is no inconsistent statute, that the city has an optional right to eject the corporation from the streets, but that, so long as the city requires the corporation to continue to give public service, it must allow compensa-

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tory rates. The Denver Case, 246 U. S. 178, 38 Sup. Ct. 278, 62 L. Ed. 649; the Detroit Case, 248 U. S. 429, 39 Sup. Ct. 151, 63 L. Ed. 341; the Toledo Case (C. C. A. 6) 259 Fed. 450, 453, 170 C. C. A. 426.

[2] A city ordinance, which refers to further service and rates, may indicate an intention that the service must be given at the rates named, or an intention that the streets must be vacated and the service abandoned unless the company accepts the rates named. The city has the right to impose this choice upon the company, and if that intent is sufficiently apparent the company cannot continue both to use the streets and reject the rates. The ordinance involved in the Detroit Case was thought by the majority of the Supreme Court to be a requirement for service and a fixing of the price, while the minority thought it to be an eviction from the streets unless the company chose to remain by accepting the prescribed conditions. It is clear enough that, if the minority interpretation had been correct, the company would have been held to be bound by the specified rates.

Without going into details, we are satisfied that the ordinance of May 26th is an eviction nisi. It was seemingly carefully drawn to bring out that purpose and effect. It follows that the bill cannot be maintained merely on the theory of the Denver and the Detroit Cases.

[3] Anticipating the possibility of this conclusion, the company plants its claim for relief also upon a statute. Section 3037d of the Kentucky Statutes was passed in 1904, and section 1 reads as follows:

"Sec. 3037d1. That eighteen months before the expiration of any franchise acquired under, or prior to the present Constitution, it shall be the duty of the proper legislative body or boards to provide for the sale of a similar franchise to the highest and best bidder, on terms and conditions, which shall be fair and reasonable to the public, to the corporation, and to the patrons of the corporations: Provided, that if there is no public necessity for the kind of public utility in question, and, if the municipality shall desire to discontinue entirely the kind of service in question, then this section shall not apply."

This statute plainly made it the duty of the city, before the expiration of the company's franchise, to prepare and offer for sale a suitable new franchise, which the company could purchase if it wished, and whereby it could continue its business and the patrons continue to receive service, without the interruption caused by building a new plant. That one purpose of this statute was to protect from being arbitrarily ejected those public utilities whose franchise expired, and to do so by requiring procedure thereunder for the benefit of the company as well as for the benefit of the city, seems to us obvious upon its face; and such purpose and effect were declared by the Kentucky Court of Appeals when it said—although obiter—in Gathright v. Byllesby, 154 Ky. 106, 126, 157 S. W. 45, 54:

"The statute requiring a sale of a similar new franchise was evidently passed for the benefit of the owner of the expiring franchise, and he only can complain if the city offers a different franchise."

The Kentucky Court of Appeals, also in the same case, quotes with seeming approval the decision of a lower court with reference to this statute, that—

"The city of Louisville must offer for sale a franchise of a character similar to that heretofore held by the [owner of the expiring franchise] before the city would be permitted to exclude that company from the use of its streets." 154 Ky. 111, 157 S. W. 47.

Adopting the same view which has been thus approved by the Kentucky courts, we conclude that the city had no lawful right to refuse to comply with section 3037d and at the same time arbitrarily to exclude the company. It follows that the situation considered by the minority in the Detroit Case is not created, and—unless for other reasons to be discussed—the company could not be compelled in May, 1921, to accept confiscatory rates as the price for being allowed to continue its business.

[4] In attacking the position of advantage thus claimed by the company, the city first says that section 3037d is unconstitutional and invalid, because section 163 of the Constitution provides, in effect, that no public service company shall use the streets without the consent of the council, and it is therefore argued that no legislative act can compel the consent of the council to the extent inherent in the carrying out of section 3037d. Specifically it is said that if, when the Home Company franchise expired the council was satisfied with the service being given by a competing company, it had the constitutional right, under section 163, to refuse consent to the longer occupation of the streets by more than one company.

It may be conceded, for the argument, that the Legislature would have no power to compel the council to permit a new and additional use of the streets, and to do so by requiring a new and second franchise to be sold when there was one in existence and satisfactory operation. Such concession does not reach this case. To compel the city to permit burdening the streets with a new easement is one thing, but it is quite another thing merely to require that the council, when it has once consented to such burden, shall be reasonable, and not arbitrary, in its treatment of the property which has been dedicated to public use under that consent, and shall not insist that such property be practically destroyed while it still desires public service of that character, and while the company continues willing to render it upon reasonable conditions. We do not doubt that the protection of invested property, to that extent, continued to be within the reasonable discretion of the Legislature, without impairment by section 163.

[5] This statute has been in force 17 years. So far as the reported Kentucky decisions show, its constitutionality has never been questioned; on the contrary, in the Gathright Case its validity was assumed. It is a familiar rule, particularly when federal courts are considering a state statute, in the absence of state decisions, that it should not be found unconstitutional, unless such a conclusion cannot be avoided. Particularly in view of this rule, we would not be justified in holding now that this section is in violation of the Kentucky Constitution.

[6] It is next urged that it is too late for the company to insist upon the rights it once would have had under this statute. It is said that the duty of the city to proceed thereunder became absolute 18 months before March, 1921, and that if the city failed to observe the

law the company's utmost right was to proceed promptly to compel compliance. What actually happened was that some time before the end of the term the city authorities had contended that telephone service by two companies was undesirable, and that there ought to be a merger between the Home Company and the (so-called) Bell Company. Three-party negotiations on that subject, more or less informal, continued from time to time. The company, before May, 1920, called the city's attention to the situation arising under section 3037d. The city did not decline to act, or say it was too late, but did nothing, and the council "pigeonholed" an ordinance for a new franchise which the company had caused to be introduced. In substantial effect, the city has continued to insist upon a merger, and has declined to proceed under section 3037d; indeed, by the answer and affidavits in this case the duty to proceed under section 3037d is in effect denied, because a new franchise would interfere with the desired merger. The very ordinance of May 21 recites that two systems are a public burden and that a merger should be had. Under all these circumstances, the city cannot be heard to say that the company has lost all right to be protected in the substantial benefits given to it by this section.

[7] So far as the letter of the statute goes, the obligation to move is upon the city, and the company might maintain the situation indefinitely by insisting that the city had no right to regulate the rates until it had complied with 3037d; but this strict view ought not to satisfy a court of equity. It might lead, as its tendency here has been, to an intolerable impasse. It is a very possible inference that the city has thought it could use the expiration of the franchise, and its delay to offer a new one, as a means of forcing the company into a merger on unsatisfactory terms; and it is equally possible that the company has thought it could use the right to a merely negative injunction to block all progress and force the city into granting overliberal franchise terms, either directly or in connection with a merger. A court of equity cannot tolerate either of these purposes. We think it is incumbent on the company, which asks an injunction for protecting its rights under section 3037d, that it should at the same time and in the same case, if it has not elsewhere done so, proceed to enforce those rights—that is to say, to proceed as far as it may for the specific performance of the statute.

A desire on the part of the company to compel the offering of a new franchise, and a willingness to buy it upon fair terms, should be conditions precedent to receiving the aid of an injunction based on this statute. The bill in this case did not contain any prayer for such affirmative proceedings; but it prayed general relief, and this is probably sufficient to authorize the imposition of any proper condition. However, an amendment in this respect would put the bill in more satisfactory form, and the company, on the argument in this court, asked leave to make such amendment. It ought to be granted, and the pleadings accordingly recast as far as necessary. Lacking such amendment, the bill should be dismissed.

[8] The informality of the bill in this respect, considering the indirect way in which the question arises, and considering that it is completely curable by amendment, ought not, we think, to be of controlling

.mportance in determining the propriety of the injunction which was ;granted.

[9] The machinery of a federal court of equity is as ample and as appropriate as that of a state court in directing and supervising compliance with this statute. The company, by reason of foreign citizenship, has the absolute and arbitrary right to select the federal court as the forum. See cases cited in the Toledo Case, supra, 259 Fed. at page 456, 170 C. C. A. 432. A federal court of equity has no more, and no less, right than a state court of equity to decide such questions as will be here involved. Each court equally must confine itself to judicial action, as distinct from legislative.

[10, 11] Coming to the direct attack upon the preliminary injunction: It is a well-established rule in this court that, upon appeal from an order granting preliminary injunction, we will not examine the question of its issue, as if the original application had been to our own discretion, but will affirm the action of the trial court, if it seems to have been fairly within the range of the discretion which that court had a right to exercise. Owensboro v. Cumberland Co., 174 Fed. 739, 747, 99 C. C. A. 1.[1] It is equally well understood that the trial court will balance the conflicting equities of the parties, and, if it appears reasonably probable that plaintiff may prevail upon the final hearing, will for the time being preserve plaintiff's supposed right against destruction, if that temporary maintenance can be accomplished without danger of greater harm to defendant than there will be of benefit to plaintiffs. We see no sufficient reasons why these principles should not be applied to such a case as this; but we proceed to notice the reasons which are alleged to the contrary.

[12] It is said that, before an injunction issues suspending a legislatively fixed rate, there should be a trial period. This has often been thought a proper preliminary step (Minnesota Rate Cases, 230 U. S. 352, 436, 33 Sup. Ct. 729, 57 L. Ed. 154, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18; Consolidated Gas Case, 212 U. S. 19, 54, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034; Knoxville Water Case, 212 U. S. 1, 17–19, 29 Sup. Ct. 148, 53 L. Ed. 371), though we think the conclusion has always been a discretionary one upon the facts of the particular case, and that there has never been any hard and fast rule to that effect. In any event, the present situation is not closely analogous to those in which the trial period has been required. In the railroad cases, as well as in the gas and water cases, the challenged law had reduced the existing rate. This would inevitably tend to increase the number of customers and to diminish the applicable overhead. There was plausible insistence that the net result would be, or might be, a gain and not a loss. In the present case, and in a very fair sense, there had been a trial period. For the year 1920, the last year of the franchise rates, the gross receipts and the operating expense and the net income were known. The company claimed that it received no substantial return upon its investment. The city did not deny that the

---

[1] The Eighth Circuit Court of Appeals applies the same rule to this class of cases. Allen v. Omaha Co., 275 Fed. 1, 3.

company was entitled to an increase in rates. The temporary ordinance, which was rejected by the company as insufficient, and which is now under attack, increased the rates between 20 per cent. and 25 per cent. above the old ordinance. It is not to be doubted that the tendency of this increase, considered alone, would be to lessen the number of customers, and thereby diminish the gross receipts and increase the distributed overhead. The main reason for requiring a trial period thus seems to be absent.

Further, in the ordinary railroad rate case, and (in less degree) with reference to a gas company in a great city, it is not practicable to provide anything like complete protection to the rights of the public in case the company finally fails. The items of excess charge are relatively trifling, and the persons who might be entitled to a refund constitute as to the railroads a fugitive class, and as to the gas company a largely shifting class. A large share of railroad travelers will in such case permanently lose the excess charges which may turn out to have been improperly paid, and with the gas company the expense of making refunds of trifling amounts, and the constant changes in the body of beneficiaries, make protection by bond substantially defective. With a telephone company in a city of this size such defects in the protection by bond are minimized. The body of ratepayers is relatively permanent, the amounts are large enough to justify the necessary bookkeeping, and the ratepayer has in his own hands a practical aid to collection through deduction from future bills. In this sort of case, when the court, as a condition of injunction against enforcing the ordinance rates, requires a bond to secure the refunding of any excessive charge that may be finally adjudged, and such a bond is given, and its sufficiency is not questioned, another, and, so far as we know, the only remaining general, reason for requiring the trial period also disappears. On the other hand, if an injunction is refused, and the company finally turns out to be right, its loss is irreparable.[2]

[13] It is also said that the rate ordinance is a law of the state, within the meaning of that term as used in the Fourteenth Amendment, and that the company is attacking it because in violation of that amendment, and therefore has the burden of showing that a state law is unconstitutional, which burden can be met only by evidence that is wholly convincing. The proposition in effect is that, when plaintiff claims it is about to be deprived of its property by an unconstitutional law, it cannot have the benefit of the usual rule for temporary protection while the case is pending, but that it must at the outset establish its case by the same degree of demonstration which will be required upon the final hearing. If the unconstitutionality depends wholly upon a matter of law this proposition is forceful; but, where the result depends upon a disputed question of fact, we think there must be some special

[2] We do not overlook that a trial period was thought proper in a telephone rate controversy in Louisville v. Cumberland Co., 225 U. S. 430, 32 Sup. Ct. 741, 56 L. Ed. 1151; but not only was that upon a final decree, but also the newly prescribed rate was a reduction, and the master had found that it would result in an increase of business after the first year, so as to cause an increased income.

circumstances—perhaps like the contingent public loss inevitable in a railway rate case—to justify refusing the plaintiff the benefit of the usual presumption that upon the final hearing he may be able to establish his claims with sufficient certainty.

[14] We come thus to what we think the controlling question in the case, viz.: Was the net balance of the evidence, pro and con, as to the confiscatory character of the ordinance rates, sufficient to give reasonable basis for the exercise of the trial court's discretion in ordering a preliminary injunction?

We will not undertake such a detailed discussion of the elements involved as would be fitting if we were reaching an independent final conclusion upon the matters in dispute. We refrain from doing so, not only because of the nature of this appeal already discussed, but also because there is an unusual probability that the record which will control any final decree will be distinctly different from that now here. The members of the court have not all been inclined to take the same view as to the questions involved, and in the endeavor to reconcile those views so much time has elapsed that the mandate will not go down until about one year after the injunction issued—indeed, the conclusion now reached is that of a majority of the court only. Thus there will have been a trial period, and the operating income and outgo upon the basis of the ordinance rates can be determined with much greater certainty than when everything was to be estimated in advance. It is sufficient to say, generally, that plaintiff's proofs tended to show such a valuation and probable net income as to indicate a return of only 1 per cent. We find it unnecessary to express our definite opinion as to any one of the elements entering into this computation. Very large deductions from plaintiff's extreme claims could be made without changing the result. For example, a cut of $1,000,000 in the valuation and of $60,000 in the estimate of depreciation for the year, leaving other elements unchanged, would only bring the return up to 3⅓ per cent. Upon this state of the record, and after giving consideration to all the various criticisms by the city, we cannot say that the trial judge's conclusion that there would be no compensatory return was so distinctly beyond the scope of his discretion on such a motion as to justify us in pronouncing it the result of an abuse of discretion, or of a misapprehension of the facts or principles involved. Further than this we need not at this time go.

[15] From what we have said it follows that, after the mandate is filed in the court below, and if the pleadings are amended according to the suggestion made, it will then be for the city to elect whether it wishes the cause to proceed to final hearing upon the theory that it is in default for not offering an ordinance under section 3037d, and to due determination of what continuing and provisional or final relief, if any, the company should have, or whether it will comply with that section and offer for sale a suitable franchise. If the latter course is taken, it can be foreseen that the court may be called upon to decide whether the terms and conditions of the ordinance so offered are "fair and reasonable to the public, to the corporation and to the patrons of the corporation," so as to constitute in fact a compliance. This will be a judicial question; and it will be for the trial court to determine whether,

if it should conclude that the offered ordinance does not meet this test, it shall content itself with merely a negative finding, leading possibly to further and repeated similar negative findings, or shall proceed affirmatively to ascertain what the terms and conditions should be in order to hasten the opportunity of the city to make its final election whether it will or will not offer an ordinance which shall, in the judgment of the court, comply with the statute.

[16] Upon this subject it has been assumed by the city that section 3037d contemplated an ordinance for the maximum term of 20 years, and it has been insisted that it is a hardship upon the city to fix at this time a rate for any long period, because of the common belief that the present high replacement value and operating expenses and rate of return, which are factors in fixing a proper rate, are temporary in substantial degree, and because no one now unnecessarily makes longtime fixed-rate contracts involving those elements.

We do not think that an ordinance should be held insufficient to satisfy the obligation of the city now involved merely because it is for a short term; no constitutional or statutory provision requires it to be for the full term. We think such an ordinance (if it is to be for an unchanging rate) should last long enough to make it worth while, but not so long as to cover these revolutionary changes in cost, which are generally anticipated but which can not be foretold, and hence that it may well be for as short a time as 3 years. It does not follow that to offer a 3-year franchise would be a permanent and ultimate performance of all duty under section 3037d. Apparently the situation will be a recurrent one; but such offer will be a sufficient compliance with the city's present duty, under existing and unusual conditions, so that the company, if it should refuse to accept for the sole reason that the term was so short, would not be entitled to equitable relief.

[17] It has recently been common, in granting franchises for say terms of 20 years, to provide for a readjustment of the rate every 5 years. If the city so desires, the ordinance to be formulated as herein provided may be of this character, rather than for a permanent rate. We think this would not be inconsistent with section 3037d.

[18] If, in the course of the procedure, an ordinance is formulated, and is determined to be, in the judgment of the court, a compliance by the city with its duty under section 3037d, it must be understood that the city council may elect whether or not to pass the ordinance. It may be that under such conditions the duty of the council would be ministerial; but we assume, for the purposes of this case at this time, that the legislative discretion of the council would be involved, and that the courts could not compel it to pass the ordinance; and, in the event of its failure to do so, it will be clear that the city, and not the company, would be at fault, and that as long as such default continued the company could properly claim the protection of equity against the enforcement of confiscatory regulation.

[19] For business telephones the old ordinance provided a rate of $4 per month. In April, and after it seemed probable that negotiations for a new ordinance would not result in agreement, the company announced on June 1st it would establish the rate of $6 per month.

Thereupon the one-year ordinance now involved fixed the rate at $5 per month. The order of the court, after enjoining the enforcement of the temporary ordinance, proceeded to enjoin the city from interfering with the company in enforcing and collecting its $6 rate. For other telephones, there were corresponding figures. This order, at least in its form, went further than is permissible in the way of judicial rate making. The latest declaration of the Supreme Court is emphatic to the effect that the court cannot make a rate (Newton v. Consolidated Co. [March 6, 1922] 257 U. S. ——, 42 Sup. Ct. 264, 66 L. Ed. ——); it can only enjoin the enforcement of confiscatory regulation. Plainly the legal effect of enjoining the enforcement of a legislative rate, and leaving the company in the performance of its functions without any regulation, is to give it the right to fix its own prices for its service, leaving for its patrons only the "take it or leave it" option.

[20] It is equally plain that if this legal right were abused by the company, through demanding an unreasonably large return, it would not come with clean hands, and no court of equity would entertain its petition for an injunction against the ordinance rate. Consequently we do not see how any court in which such a controversy is pending can avoid considering and deciding whether the rate which the company is charging, or proposes to charge, is unreasonable. It is only another form of expressing the same principle to say that the court may require the company to submit to reasonable conditions as the price of obtaining the favorable exercise of judicial discretion. It is these considerations which lead to the thought that perhaps it was in form only in which the injunction went too far in the direction of fixing a rate. However, in compliance with what seems to be the view of the Supreme Court, this paragraph should be eliminated from the injunction; in other respects it is approved.

[21] Since the order was provisional, and our order is based upon the grounds stated, the trial court will be at full liberty to revise its conclusion at any time, and will of course entertain and decide any application by the city to modify or vacate the existing order, whether based on a showing of the reduced figures of cost and operation now expected to develop, or upon a more complete showing of the vital facts than the city formerly had opportunity to make, or upon both. Even if no ordinance is offered and bought pursuant to the procedure contemplated, the injunction ought not to be continued in aid of any rate higher than may be reasonable for a merely temporary situation upon the basis of a comparison with the rate to be fixed by the ordinance which is found proper.

[22] Further, as a condition for the continuing of any injunction, the company should file, on or before the 15th of June, 1922, and of each month thereafter (until an ordinance be offered and bought), a sworn statement showing, with reasonable detail, its operating income earned and operating expense incurred during the previous month. It may also show the additional facts which it deems proper to indicate the net result for the month as compared with the result to which it deems itself entitled.

The case will be remanded for the entry of an order, modified as herein directed. No costs will be awarded in this court.