UNITED STATES et al. v. REPUBLIC OIL REFINING CO.

SAME v. HARTOL PRODUCTS CORPORATION.

District Court, D. New Jersey.
Oct. 17, 1934.

898

Harlan Besson, U. S. Atty., of Trenton, N. J., W. B. W. Snyder and Morris R. Clark, Sp. Assts. to Atty. Gen., and Robert L. Stern, Sp. Atty., of New York City, for plaintiffs.

Thomas G. Haight, of Jersey City, N. J., Ira C. Houck, of Pittsburgh, Pa., and George G. Tennant, Jr., of Jersey City, N. J., for defendant Republic Oil Refining Co.

Merritt Lane, of Newark, N. J., Todd Lee Wynne, of Athens, Tex., and H. Victor Crawford, of New York City, for defendant Hartol Products Corporation.

FORMAN, District Judge.

On October 6, 1934, a bill of complaint was filed in the case wherein the Republic Oil Refining Company was named as defendant.

In brief the bill recites that pursuant to the provisions of title 1, § 9 (c) of an Act of Congress, approved June 16, 1933, known as the National Industrial Recovery Act (15 USCA § 709(c) the President of the United States is authorized to prohibit the transportation in interstate commerce of petroleum and the products thereof, produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any state law or valid regulation or order prescribed thereunder by any board, commission, officer, or other duly authorized agency of a state.

On July 11, 1933, the President, pursuant to said law (Executive Order No. 6199 [15 USCA § 709 note]), prohibited such transportation as aforesaid and on July 14, 1933 (Executive Order No. 6204 [15 USCA § 709 note]), by a further Executive Order, delegated to the Secretary of the Interior of the United States all powers vested in him for the purpose of enforcing section 9 (c) of the act aforesaid.

The bill further alleges that the production of crude petroleum and petroleum products are regulated by statute in the state of Texas, and that during the months of August and September, 1934, nearly 4,500,000 barrels of crude petroleum were produced in the East Texas oil field, in defiance of the said Texas statute requiring certain "tenders" or certificates of clearance.

Specifically paragraph VII of the said bill alleges the following:

"That some or all of said oil produced and withdrawn from storage in violation of the law of the State of Texas and the rules and regulations issued thereunder, were attached to and received by the following named refineries located in the East Texas oil fields:

Gilliland Refining Company
                    Gladewater, Texas
Pope Refinery Company
Linzie Refining Company  Gladewater, Texas
Culver                   Gladewater, Texas
Blue Diamond         Gladewater, Texas
Keystone Refining Company
Wabash Refining Company
Lone Star Refining Company
Jackson Refining Company
Consolidated Refining Company
Utah Refining Company
Chief Refining Company
Texas Refining Company    Kilgore, Texas
A. J. Adams Oil Company

"That some or all of the petroleum or the products thereof thus illegally produced and withdrawn from storage were shipped from the above named refineries to the tidewater terminal of the defendant Republic Oil Refining Company, located at Texas City, Texas; that some or all of the said petroleum and the products thereof were at the tidewater terminal of the defendant Republic Oil Refining Company, loaded aboard the American Tanker S. S. Pueblo on or about September 27, 1934 in the amount of approximately 45,570.50 barrels for transportation in interstate commerce from the State of Texas to the State of New Jersey, and consigned to the defendant Republic Oil Refining Company. That upon the affidavits attached hereto and upon information and belief of the undersigned, it is alleged that the petroleum and/or petroleum products now aboard the S. S. Pueblo, bound for the port of Carteret in the State of New Jersey, within this jurisdiction, were produced in the East Texas field and refined in said location in violation of the laws of the State of Texas and regulations issued pursuant thereto, and that neither the owners, consignors nor consignees, nor any other persons in connection therewith have received, or have in their possession the tender or certificates of clearance covering the crude oil from which the cargo of said vessel was refined or manufactured, and that attached hereto is the affidavit of Roy D. Payne, an employee of the Texas Railroad Commission, having his office

in Kilgore, Texas, alleging that he is familiar with the records of said Commission and more particularly familiar with all reports of the violations of the rules and regulations of the said Commission, and particularly insofar as they relate to the production, refining and transportation of oil in the East Texas field, and that agents and investigators under his supervision and control have from time to time in the past and up to and including the months of May, June, July, August and September, 1934, reported to him many instances of oil being run from adjacent leases to various of the above named refineries, and that since these refineries have received no oil whatsoever on legal and approved tenders, all of the said oil is illegal and produced and transported in violation of the rules and regulations of the Texas Railroad Commission, and the laws of the State of Texas; and that attached hereto is the affidavit of James R. Lewis and James R. McConnell, Special Agents of the Division of Investigations, Department of the Interior, by which it appears that on September 27, 1934, they interviewed C. E. Robertson, refinery superintendent of the Republic Oil Refining Company at Texas City, Texas, and were informed by Mr. Robertson that the Tanker S. S. Pueblo would finish loading that afternoon with a cargo of high octane gasoline from their 80,000 barrel storage tank, number 51, and that it would sail that afternoon for Carteret, New Jersey."

The bill proceeds generally to charge that the movement of petroleum and petroleum products thus illegally produced, refined, and transported in interstate commerce constitutes an obstruction and burden to the free flow of interstate commerce; that it interferes with the policies of the National Industrial Recovery Act (48 Stat. 195) and of the Congress of the United States of America; is detrimental to the general welfare of the people of the United States, in that such petroleum tends to increase interstate commerce between Texas and other states and decreases that production from other petroleum producing states to their sister states; that such traffic demoralizes the natural normal flow of petroleum in interstate commerce and that the United States, as one of the largest owners of oil lands and oil royalty, has a direct property interest in the stability of interstate commerce in petroleum products.

It further charges that the cargo of the tanker steamship Pueblo contained petroleum or petroleum products which had been produced in violation of the laws of Texas and that by reason of the commingling of such products with other petroleum or petroleum products the entire cargo of said vessel was illegally transported in interstate commerce.

The plaintiffs had no remedy at law and that irreparable damage and injury would result to the plaintiffs and the nation if the cargo of said tanker steamship Pueblo was permitted to be discharged.

Plaintiffs pray that a temporary restraining order be issued against the defendant company enjoining it from unloading the tanker steamship Pueblo and that a time and place be fixed for the defendant to appear and show cause why the temporary restraining order should not be made permanent.

On October 8, 1934, a bill of complaint was filed against the Hartol Products Corporation, containing generally the same allegations, but specifically, in paragraph 7, the following charge:

"That during the months of August and September, 1934, the Texas Railroad Commission prescribed total quotas of allowable production from the East Texas oil field and divided the said total allowables among the wells in the said field.

"That upon the information contained in the affidavits in support hereof, and upon the belief of the undersigned, it is alleged that during the month of September, 1934, the United East and West Oil Company's well on the Dunaway land on Block 5, Gladewater Townsite, Gregg County, Texas, produced and delivered to the Gladewater Refining Company pipeline a total of 1,634.92 barrels of crude oil, as well as 492 barrels of crude oil, part of which is still in the leased tanks, and that the total of these amounts being 2,126.92 barrels of crude oil was produced from said well during said month of September; that the maximum allowable of crude oil permitted to be produced from said well during the month of September, 1934, under the rules and regulations of the Railroad Commission of the State of Texas was 1,050 barrels, and that there was produced in excess of this amount 1,076.92 in excess of said allowable permitted by said Railroad Commission, and that these facts are more particularly set forth in the affidavits of D. S. Raney and E. N. Stanley hereto attached; that the Foxwood Well on the Morgan Gin lot, Block 4, Gladewater Townsite, produced and delivered to the Gladewater Refining Company pipeline during the month of August, 1934, 2,405.88 barrels of crude oil; that

the maximum allowable of crude oil permitted to be produced from said well during the month of August, 1934, under the rules and regulations of the Railroad Commission of the State of Texas was 1,193.5 barrels, and that said well produced 1,212.38 barrels of crude oil in excess of the allowable permitted by said Railroad Commission, and that this is more particularly and at large set forth in the affidavits of J. I. Morgan and E. N. Stanley, and the affidavit of David C. McCaleb, which is hereto annexed; that the Gladewater Refining Company operates a gathering system and pipeline purchasing and running crude oil from various wells in Gregg County, Texas, among which are the two above described wells, as is more particularly alleged and set forth in the affidavit of C. R. Starnes, President of said Gladewater Refining Company, which is hereto annexed; that said crude oil shown to be produced in excess of the said allowables of the Texas Railroad Commission was all delivered to the Gladewater Refining Company pipeline and in it commingled with the other oil gathered and purchased from other wells; that said Gladewater Refining Company delivered the said commingled oil in its pipeline to the pipeline of the East Texas Pipeline Company, and that said pipeline delivered said commingled oil to the East Texas Refining Company refinery, and that at said refinery there was manufactured into products of petroleum the commingled oil received in part as hereinabove set forth from the said two wells above mentioned as having produced beyond their allowables during the months of August and September, 1934, respectively; that some or all of the petroleum or the petroleum products thus illegally produced and withdrawn from storage was shipped from the East Texas Refining Company to the Harbur Terminal Company at Texas City, Texas, by means of tank cars in the form of casinghead gasoline and cracked gasoline; and that some or all of said casinghead gasoline and cracked gasoline was loaded upon the American Tanker S. S. Phoenix, and that the loading thereof commenced on September 27, 1934, and terminated on September 29, 1934, and that said vessel contained a cargo of 60,474.44 barrels of gasoline, containing thereon the products of the commingled petroleum produced from the wells hereinbefore mentioned; and that said cargo of casinghead gasoline and cracked gasoline is now consigned by the Hartol Products Corporation aforesaid, to the Hartol Products Corporation at Bayonne in the State of New Jersey, said gasoline having come into the possession, by purchase or otherwise, of the said cargo, and that the said gasoline is now in transportation in interstate commerce from the State of Texas to the State of New Jersey, aboard the said S. S. Phoenix now at sea and bound for the port of Bayonne in the State of New Jersey, within the jurisdiction of this court; and that the petroleum and/or petroleum products now aboard the said S. S. Phoenix bound for the port of Bayonne in the State of New Jersey, was produced in the East Texas field and refined in said location in violation of the laws of the State of Texas and regulations pursuant thereto, and neither the owners, consignors or consignees, nor any other persons in connection therewith have received, or have in their possession the tender or certificates of clearance covering the crude oil from which the cargo of said vessel was refined or manufactured, insofar as they covered the commingled products of the two oil wells hereinabove more particularly mentioned and described, for the months of August and September, 1934, respectively."

On October 6, 1934, a temporary restraining order was issued and served in accordance with the prayer of the bill in the case in which the Republic Oil Refining Company is defendant, enjoining the discharge of the cargo from its steamer the tanker steamship Pueblo. It was returnable on October 9, 1934.

On October 8, 1934, a similar temporary restraining order was issued in the case in which the Hartol Products Corporation is defendant, enjoining the discharge of the cargo of the tanker steamship Phoenix. This was returnable October 11, 1934.

The return day in the order of the Republic Oil Refining Company case was continued until October 11, 1934, at which time a hearing was had in both causes.

Affidavits were filed by all parties concerned, some testimony was taken and oral argument heard, at the close of which the petitioners contended that the temporary restraint should be made permanent, and the defendants in both cases moved to discharge the orders to show cause and to dismiss the bills.

Section 9 (c) of the National Industrial Recovery Act provides as follows:

"The President is authorized to prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be pro-

duced or withdrawn from storage by any State law or valid regulation or order prescribed thereunder by any board, commission, officer, or other duly authorized agency of a State. Any violation of any order of the President issued under the provisions of this subsection shall be punishable by fine of not to exceed $1,000, or imprisonment for not to exceed six months, or both."

The Executive Order of the President (No. 6199 [see 15 USCA § 709 note]) provides as follows:

"By virtue of the authority vested in me by the Act of Congress entitled 'An Act to encourage national industrial recovery, to foster fair competition, and to provide for the construction of certain useful public works, and for other purposes', approved June 16, 1933 (Public No. 67, 73d Congress) the transportation in interstate and foreign commerce petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any State law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a State, is hereby prohibited."

The state of Texas has sought to regulate the production of petroleum and petroleum products in the so-called East Texas field by legislation and by regulations promulgated by its agencies, and various forms or records are required to be filed in designated offices. The Department of the Interior of the United States has likewise promulgated regulations requiring the filing of forms and records.

In both cases under consideration the defendants are not charged themselves with overproducing or, as far as I can ascertain, failing to file proper records. The charge is made that they have permitted to be commingled with their cargoes in question, petroleum or petroleum products which were produced or transported in violation of the said laws and regulations, prior to the movement of the vessels in these cases.

In the case in which the Hartol Products Corporation is the defendant, the plaintiffs allege that the original dereliction occurred when, during September, 1934, a well known as the Anderson Rogers Lease in Gladewater, Tex., overproduced 1,077 barrels of oil. This excess oil was delivered to the Gladewater Refining Company's pipe lines, which in turn delivered the same oil to the East Texas Pipe Line Company for the account of the East Texas Refining Company. During August, 1934, a well known as Morgan Gin Lot in Gladewater, Tex., overproduced 527 barrels of crude oil which went into the pipe line of the Gladewater Refining Company, from where it was delivered to the East Texas Pipe Line Company for the account of the East Texas Company. The oil was refined by that company and with thousands of other barrels of oil was shipped to tanks of the Harbur Terminal Company at Texas City, Tex., from which tanks it was withdrawn and loaded into the tanker steamship Phoenix and consigned to the defendant Hartol Products Corporation, at Bayonne, N. J.

In the case where the Republic Oil Refining Company is defendant it is alleged by plaintiffs that petroleum products were illegally transported by refiners in East Texas fields, which finally found its way into the tanks of the defendant's refinery in Texas, where it was made into gasoline and shipped aboard the defendant's tanker steamship Pueblo to its storage facilities in New Jersey, Maryland, and Virginia, and that the cargo was therefore contaminated.

As each vessel docked in New Jersey, it was met with the order to show cause issued in the respective cases, as heretofore set forth, and the discharge of its cargo restrained. Under stipulation the cargo in each case has been set ashore in sealed tanks so as to release the vessels in question. Otherwise tremendous expense would be incurred in demurrage, and shipping and wharfage facilities demoralized at the docks where these vessels were tied.

Let us then first analyze the proofs which have been adduced in affidavit form in support of the bill in the case in which the Hartol Products Corporation is defendant.

It is realized that the legislation which forms the basis of this action is very recent and that the plaintiffs' agents were obliged to gather the information which they set forth in the affidavits with tremendous haste, so that their informal and incoherent form is excusable if they substantially contain legal evidence.

The first affidavit is made by Special Agent Simpson, of the Division of Investigation, Department of Interior, and refers to the authenticity of affidavits by H. H. Knox and F. W. Huguet, which are to follow.

The next affidavit is made by David C. McCaleb, who is a special agent for oil enforcement for the Division of Investigations, Department of the Interior of the United States. He says that he "learned that the

United East and West Oil Company's well on the Dunaway land on Block 5, Gladewater townsite, Gregg County, Texas, produced and delivered to the Gladewater Refining Company pipe line during the month of September, 1934, a total of 1,634.92 barrels of crude oil, as well as 492 barrels of crude oil part of which is still in the lease tanks, making a total of 2,126.92 barrels of crude oil produced from this well during the month of September, 1934."

He swears that the maximum allowable of crude oil permitted to be produced from this well during the month of September, 1934, was 1,050 barrels, and says that this will be shown ·in affidavits of D. S. Raney and E. N. Stanley.

He further says that he has "learned that the Fox Wood well on the Morgan Gin Lot, Block. 4, Gladewater townsite, produced and delivered to the Gladewater Refining Company pipe line during the month of August, 1934, a total of 2,405.88 barrels of crude oil." He says that the maximum allowable of crude oil permitted to be produced from this well during the month of August, 1934, was 1,193.5 barrels.

He further swears that the Gladewater Refining Company operates a gathering system and pipe line, purchasing and running crude oil produced from various wells in Gregg county, Tex., *among which are the two above-described wells,* and refers to the affidavit of C. R. Starnes, president of the Gladewater Refining Company.

He further says that the crude oil "showed to be produced in excess of the allowable of the Texas Railroad Commission was all delivered to the Gladewater Refining Company pipe line and in it commingled with the other oil gathered and purchased from other wells."

He then concludes that the commingled oil *must necessarily* have been delivered by Gladewater Refining Company to East Texas Pipe Line and by that pipe. line delivered to the East Texas Refining Company refinery and there manufactured into products of petroleum as several deliveries of crude oil were made by Gladewater Refining Company to East Texas Refining Company through East Texas Pipe Line Company's pipe line during. the months of August and September, 1934, in a total amount of 53,028.50 barrels, as shown by affidavit of C. R. Starnes, president of Gladewater Refining Company, dated October 4, 1934, which was obtained by the affiant, and that as the total of 3,265.13 barrels of the crude oil produced from the above-mentioned wells, which were overproduced as above set forth, were commingled with the other oil delivered to East Texas Refining Company, it *necessarily must follow* that part of this crude oil which was legally. produced *must have been used* in the manufacture of petroleum produced by East Texas Refining Company during August and September, 1934. (Italics mine.)

The evidence sought to be established by this affidavit can hardly be declared legal. The affiant swears as to facts that he "learned" without establishing just how he "learned" them. It is assumed that he learned some of them from the next affiant, who appears to be D. S. Raney, who swears that he for two months prior to October 4, 1934, was a royalty gauger in the employ of Mr. J. I. Morgan, and proceeds in his affidavit to set forth results of his gaugings of four oil wells in question, two on the J. F. Anderson Rogers Lease, block 80, Gladewater townsite, and two on the United East & West Oil Company Dunaway Lease, Gladewater townsite. He says that there were produced from this United East & West Oil Company well on the . Dunaway Lease and run into the Gladewater Refining Company pipe line between September 1, 1934, and September 13, 1934, 1,-634.92 barrels of crude oil. How he arrives at this figure is not shown. What his method of measurement was is not indicated, and, in fact, I have not been. able to follow his conclusions as to the production of these oil wells or of the other oil wells of which he speaks.

There then follows an affidavit, or at least a carbon copy of an affidavit, by J. I. Morgan, which seems to concern itself with royalties paid to him for various months. The only reference to the month of August, 1934, is indicated in the fourth paragraph of his affidavit, wherein he says: "That for the month of August, 1934, he was rendered a statement by the Gladewater Refining Company, dated September 12, 1934, showing that this company had run 1,630.21 barrels of oil which had been produced from this well. That the statement showed that he was to be paid $199.24 for his $\frac{1}{8}$ royalty interest for the month of August, 1934, and $348.67 for his one-fourth of $\frac{7}{8}$ oil payment for the same month." There is no copy of this statement which he says was furnished to him annexed to the affidavit, but simply his affirmation that such a statement had been furnished to him.

The next affidavit is made by E. N. Stanley, who is an employee of the Railroad Com-

mission of Texas, and he states that the allowable production, as permitted by the rules and regulations of the Texas Railroad Commission for the United East & West Oil Company's well on the G. C. Dunaway, block 5, Gladewater townsite, for the month of September, 1934, is 1,050 barrels.

Then follows another affidavit by the same E. N. Stanley, in which the relevant portion seems to be that the allowable production for the Fox Wood well for the month of August, 1934, was 1,103.6 barrels. He then gives the allowable productions for the G. C. Dunaway well for April, 1934, and for the Fox Wood well for May, 1934.

A reference to paragraph 7 of the bill of complaint will disclose that there is charged therein, on page 4 thereof, that the maximum allowable of crude oil permitted to be produced from the Fox Wood well during the month of August, 1934, was 1,193.5 barrels. It is to be noted that in this affidavit Mr. Stanley says that it was 1,103.6 barrels. The draughtsman of the bill evidently confused this figure with the allowable production of this well for May, 1934 (1,193.5 barrels), as set forth in the last paragraph of Stanley's said affidavit.

The next affidavit is that of C. R. Starnes, in which he recites that he arranged a sale of crude oil to the East Texas Refining Company in September, 1934, and in August, 1934, of something over 50,000 barrels, "which crude oil was purchased from the various wells in Gregg County, Texas, from which the Gladewater Refining Company was running oil during the months of August and September, 1934."

It will be recalled that David C. McCaleb in his affidavit definitely charged that the Gladewater Refining Company operated a gathering system and pipe line purchasing and running crude oil produced from various wells in Gregg county, Tex., "among which are the two above described wells," and referred to this affidavit of C. R. Starnes, president of the Gladewater Refining Company.

From the text of this affidavit, there is only one reasonable inference, and that is that the affidavit of Starnes would disclose that "the two above described wells" furnished a part of the running crude oil, but an examination of the Starnes' affidavit fails utterly to substantiate any such statement. It is entirely general in its nature and it may be searched in vain for some reference to the wells in question.

There follow many affidavits having to do with the location of tank cars and their consignees, consignors, and destinations, the materiality or relevancy of which it is impossible for me to perceive because of their total lack of continuity.

On the other hand, the defendant produces an affidavit by the same C. R. Starnes, president of the Gladewater Refining Company, who swears that he knows of his own knowledge that none of the crude oil produced by the so-called Dunaway well at any time during the month of September, 1934, entered the Gladewater Refining Company's pipe line or any line or tank from which the crude oil was subsequently delivered to the East Texas Refining Company; that the said oil being produced by said well in September contained large quantities of basic sediment and water, and for that reason was not classed as pipe line oil; "that on all deliveries made to East Texas Refining Company during the months of August and September, 1934, the required form of Tender EN 3 was prepared and approved by the Railroad Commission of Texas, and such Tenders all bear the signature of E. N. Stanley," and, in fact, there is annexed to the said affidavit a certificate covering tenders for 29,705 barrels of crude oil approved by E. N. Stanley. His signature is the same as that appearing in the affidavits signed by him and annexed to the plaintiffs' bill of complaint.

At least ten other affidavits are filed by the defendant and are entitled to equal consideration with those of the plaintiffs. In my opinion they overwhelmingly counteract those filed by the plaintiffs.

█ It is to be recalled that in this proceeding the attempt is made to fasten the alleged wrongful production of the oil at its source upon a purchaser removed by several transactions from that source of production; in other words, the defendant here is neither the producer of the oil nor is it even the refiner of the oil, it is simply a purchaser of a petroleum product, namely, gasoline, and where the plaintiffs seek to burden such a purchaser with the sins of the producer, it should be upon clear and conclusive evidence.

Now, let us look to the evidence in the case wherein the Republic Oil Refining Company is defendant.

The first, fifth, and sixth affidavits appended to the bill in this case are executed by one Francis E. Stancil, who makes assertions therein such as the following: "That when it came to my knowledge that Gilliland,

who enjoys a 'hot oil' reputation, was interested, I made myself clear in re oil matters. That I acquainted them with the fact that I was a prorationist and a law-abiding citizen; that to substantiate and prove my attitude I can testify that before this I went to Chas. I. Francis, Special Assistant to the United States Attorney General, and sought his aid in stopping excess production * * *," etc., and again that the subject-matter to which he swears was information conveyed to him by one Jack Kinnamer.

The affidavits indicate that the affiant definitely believes that he has a grievance because arbitrary prices are set forth by his lessees upon what he should be paid per barrel for oil produced by certain wells. The evidence, if any, contained within his affidavits is not of a legal character such as to permit the court to consider it.

An affidavit by E. N. Stanley, chief engineer of the oil and gas division, Texas Railroad Commission, gives an interpretation of the rules and regulations concerning "tenders," so-called, as approved by the Texas Railroad Commission.

The affidavit by Roy D. Payne, an employee of the Texas Railroad Commission, containing the statement that "agents of the Texas Railroad Commission, working under the supervision of affiant, have continuously reported violations of the conservation laws of the state of Texas by the following named firms, corporations or persons:

Gilliland Refining Company
Pope Refinery Company
Linzie Refining Company
Culver, at Gladewater
Blue Diamond, at Gladewater
Keystone Refining Company
Wabash Refining Company
Lone Star Refining Company
Jackson Refining Company
Consolidated Refining Company
Utah Refining Company
Chief Refining Company
Texas Refining Company, Kilgore, Texas
A. J. Adams Oil Company."

This affidavit is hearsay almost in toto.

The affidavit by M. D. Carter, chief clerk of the tender department of the Texas Railroad Commission, is to the effect that three refining companies have never been issued tenders covering receipts of crude oil.

A joint affidavit of James R. Lewis and James R. McConnell indicates the extent of their investigation of the defendant company's records.

Another affidavit by two other investigators, John I. Watson and James R. McConnell, indicates a further investigation of the Republic Oil Refining Company and records of the Texas City Terminal Railway Company at Texas City.

There follows an affidavit by C. N. Guinn containing general charges, "that he knows of an oil well about 1,000 feet from his house in Gladewater, Texas that is overproducing about 1,000 barrels of oil daily"; and that it is common knowledge in that area that a certain named person is the worst violator in Gladewater, Tex., and that the State Railroad Commission agents have not stopped the flow of this well; all of which charges it would hardly seem fair to call upon the defendant to meet.

A large number of further affidavits having to do with the transportation of petroleum or petroleum products follow, but are likewise not relevant to the charge for which this defendant is to be held accountable.

On the other hand, the affidavit of the president of the defendant, together with a supplemental affidavit, seems to indicate that the defendant took at least some precaution in specifying in its contracts of purchase that the oil to be delivered to it was to be purchased in compliance with the law.

Again, in this case I do not think that it is necessary to analyze in further detail the defendant's affidavits, for I feel that a mere perusal of them leads to the inevitable conclusion that they amply counteract those of the petitioners.

■ Relief by injunction is drastic and will only be granted in extraordinary cases. Curtis Publishing Co. v. Federal Trade Commission, 270 F. 881, 914 (C. C. A. 3), Williamson Candy Co. v. Ucanco, 297 F. 454 (C. C. A. 8).

■ The principle is firmly established that whether a preliminary injunction shall be awarded rests in the sound discretion of the trial court. Meccano, Ltd. v. John Wanamaker, 253 U. S. 136, 40 S. Ct. 463, 64 L. Ed. 822; Buffington v. Harvey, 95 U. S. 99, 24 L. Ed. 381. This discretion must be exercised according to the established law and rules of equity. Behre v. Anchor Insurance Co., 297 F. 986 (C. C. A. 2); Kryptok Co. v. Stead Lens Co., 190 F. 767, 39 L. R. A. (N. S.) 1 (C. C. A. 8).

It is established that the court will balance the conflicting equities of the parties, and, if it appears probable that the complainant will establish his right on a final hearing, the court will for the time being preserve his apparent right provided that can be accomplished without subjecting the defendant to the danger of greater harm than the complainant will be benefited by the relief. City of Louisville v. Louisville Home Telephone Co., 279 F. 949 (C. C. A. 6); Pyle v. Texas Transport & Terminal Co. (D. C.) 185 F. 309. But a preliminary injunction will not be granted in a doubtful case; particularly where great damage will not result to the applicant. The right should plainly appear as well as the pressing necessity for the relief. This is true in a case where the proofs leave the court in serious doubt in regard to the right asserted by the complainant (Brooklyn Baseball Club v. McGuire (C. C.) 116 F. 782; Sperry & Hutchinson Co. v. Pommer (D. C.) 199 F. 309), or where the facts are in serious dispute (Hall Signal Co. v. General Railway Signal Co., 153 F. 907 (C. C. A. 2), Southern Counties Gas. Co. v. City of Long Beach (D. C.) 295 F. 530). If upon examination of the pleadings and affidavits it appears that the complainant has a questionable case, the preliminary injunction ought to be denied and restraining order vacated. Anargyros & Co. v. Anargyros (C. C. A.) 167 F. 753.

Many other questions were raised and argued at the hearing, but decision as to those points is made unnecessary by the present disposition of the cases.

I am, therefore, constrained to refuse to make permanent the temporary restraining orders heretofore granted, and, in fact, I will grant the motions of the defendants to dissolve the present restraining orders.

It will be noted that plaintiffs' prayers for relief are as follows:

"Wherefore, plaintiffs pray that this court issue a temporary restraining order without notice against the defendant above named, and its officers, agents, servants, employees and attorneys, restraining and enjoining the said defendant and its officers, agents, servants, employees and attorneys, and each of them, from unloading from the American Tanker Phoenix (Pueblo)* any or all of the petroleum or petroleum products now being cargo thereon and from in any manner whatsoever discharging, receiving, storing, transporting, distributing, selling and disposing of said petroleum or petroleum products now being on the American Tanker

Phoenix (Pueblo)* or having been included in the cargo thereof and that the court fix a time and place and issue an order to the defendant to appear and show cause if any of them may have, why said temporary restraining order should not be made permanent and that the court likewise issue an order directing the marshal to serve on the defendant a certified copy of said order and that the court grant such other and further relief as may be just, meet and equitable in the premises."

(* The prayer is identical in each case except for the name of the vessel as indicated in the parenthesis which is mine.)

Having refused to make permanent the temporary restraining orders and having dissolved them, it is purposeless to continue the actions and the defendants' motions to dismiss the bills will be granted.