### CITY OF TOLEDO v. TOLEDO RYS. & LIGHT CO. et al.

(Circuit Court of Appeals, Sixth Circuit.   June 4, 1919.)

No. 3262.

1. STREET RAILROADS ⊜⇒66—EXPIRATION OF FRANCHISE—RIGHTS OF PARTIES.
    On expiration of the franchise rights of a street railroad company to use the streets of a city if the company at the city's request continues to occupy the streets and to give service, the regulatory power of the city can be exercised only subject to the condition that it must not bring about confiscation.

2. CARRIERS ⊜⇒18(6)—INTERFERENCE WITH OPERATION BY CITY—REGULATION OF RATES—INJUNCTION.
    An order granting a preliminary injunction restraining a city from interference with the control, operation, or management of a street railway system by the company or with its collection of fares in accordance with a schedule adopted, but expressly recognizing the right of the city to act through appropriate legislation, *held* justified by threatened executive interference.

3. COURTS ⊜⇒316—JURISDICTION OF FEDERAL COURTS—COLLUSIVE SUIT.
    The fact alone that a complainant through ownership of stock of another corporation had a controlling stock interest in defendant corporation *held* not to deprive a federal court of jurisdiction, where there was the requisite diversity of citizenship.

4. COURTS ⊜⇒30—DORMANT SUIT—LOSS OF JURISDICTION.
    While a court will not permit a case to lie dormant indefinitely, with the consent of everybody, and then allow it to be used by one party against the objection of the other, as a basis for exercising power that would not otherwise exist, mere unexplained inaction for a year and a half does not ipso facto destroy the power of the court to proceed when both parties consent.

5. COURTS ⊜⇒278—DORMANT SUIT—LOSS OF JURISDICTION.
    Where, after the decision of federal court to appoint a receiver for a street railroad company, a plan was agreed to by the parties for the operation of the property under direction of the court which was in effect a substitute for the receivership, which plan was carried out for a number of years, the court did not during such time lose jurisdiction of the case.

6. COURTS ⊜⇒282(1) — JURISDICTION OF FEDERAL COURTS — CONSTITUTIONAL QUESTIONS.
    A federal court has jurisdiction of a bill, whether original or ancillary, which raises an issue involving constitutional rights.

7. CARRIERS ⊜⇒18(6)—RATES OF FARE—POWER OF COURTS—INJUNCTION.
    While a court is without power to affirmatively fix rates of fare to be charged by a street railroad company, it may determine that the enforcement of a rate lower than one proposed would be confiscatory and enjoin the same, and may refuse an injunction, unless the company will accept that rate which the court finds to be reasonable.

8. CARRIERS ⊜⇒18(6)—RATES OF FARE—INJUNCTION.
    The rule sometimes followed of permitting enforcement of a reduced rate of charge by a public service corporation, as a street railroad company, for a trial period, does not require a trial period for a partial increase, where the unchallenged computations show a larger increase to be necessary.

Appeal from the District Court of the United States for the Western Division of the Northern District of Ohio; John M. Killits, Judge.

Suit by Doherty & Co. against the Toledo Railways & Light Company and the City of Toledo.   The City appeals from an order grant-

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ing a preliminary injunction on a cross-bill by the Railways Company. Affirmed.

The city of Toledo appeals from an order for temporary injunction which restrained it from certain interference with the street railway system operating in that city. The city's complaints are reducible to three: First, that there was no reasonable cause to anticipate unlawful conduct by the city; second, that the injunction prevents proper legislative action by the city; and, third, that the court below was without jurisdiction. The appeal involves more or less directly the long and complicated history of the relations between the city and the street railway system, and of the litigation which is now before us. For present purposes, a brief recapitulation will be sufficient; many of the details will be found more fully stated in the opinions of the District Court, reported in United States v. Toledo Newspaper Co., 220 Fed. 458, and Doherty & Co. v. Toledo Railways & Light Co., 254 Fed. 597.

Early in 1914, the most important street railway franchises were about to expire. The city was endeavoring to secure future operation under an ordinance granting the use of the streets, but prescribing a three-cent fare. Doherty & Co., a partnership, who were citizens of New York, filed, in the court below, a creditors' bill in the usual form. It alleged the recovery of a judgment against the street railway company and an execution returned unsatisfied and the existence of equitable assets and prayed the appointment of a receiver, and a motion therefor was entered. Shortly thereafter, by an amended and supplemental bill, it brought in the city of Toledo as an additional defendant, alleged that the course of action being pursued by the city was resulting in the unlawful destruction of the assets of the company, upon which plaintiffs had an equitable lien and which they were seeking to have the court take into its possession, and prayed that the city be enjoined. The court at first refused an injunction, as it seemed that the city was proposing to act by legislation and by judicial proceedings; but later, when it appeared that the city was proceeding by force to impair unlawfully the property interests involved, a preliminary injunction issued. This was in September, 1914. No appeal was ever taken, and the injunction has ever since continued in force; it was fully respected; and that phase of the controversy has continued to be quiescent.

In connection with this injunction proceeding, the railway company had filed its answer to the Doherty bill, also claiming, on its own account, relief against the city similar to that asked by the bill, and the city had filed its answer both to the amended bill and the city's dependent cross-bill, so that the issues were fully joined. No proofs were taken by any party, excepting upon the motion for preliminary injunction. While the case stood thus, and in April, 1916, a dispute arose between the company and its employés as to wages and service conditions. It resulted in a strike and a cessation of service; whereupon, the city filed, in this same Doherty Case, its "amended and supplemental answer and cross-bill," alleging that an uninterrupted continuation of the street railway service was essential to the public interest, and praying that a receiver of the street railway system be appointed by the court below, who should operate the system under the orders of the court and restore the public service to which the system was devoted. This motion for receiver came on to be heard, and there was more or less informal discussion and presentation of facts. The company professed to be willing to make wage increases, if it could have increased earnings available therefor. The court determined to appoint a receiver, announced that determination, and prepared an order fixing the conditions under which the receiver should operate. For such appointment there was substituted a plan devised by the court, and acquiesced in by the city and the company, that the company should make certain increases in wages, with which the employés were, at the time, content, and should charge increased fares. By the computation then approved by all, it seemed that the increase in fares would produce an excess additional income beyond that required to meet the increase in wages, and it was likewise arranged that such excess should be paid every month to a custodian appointed by the court, and should be expended from time to time by him, under the direction of the court, in the

purchase of new equipment. Pursuant to this plan, an order was entered appointing such custodian and directing such payments; and from time to time, from then until now, the fund has accumulated and the court has directed and approved disbursements out of it. The application for a receiver was not directly passed upon, and, in form at least, it has ever since continued as a pending motion.

In the spring of 1918, a wages controversy again arose. The employés demanded a large increase. The company professed to be willing to grant satisfactory increases if it could have additional revenues, but insisted that it would be utterly unable to do so from its existing income. Negotiations with the city, as to an increase of fares, resulted in no agreement. Thereupon, the company announced that, on May 10th, it would put into operation a new and advanced schedule, epitomized as "5 cents straight, 1 cent for transfers," and would make a corresponding advance in wages. Further negotiations and discussions resulted in statements which the company interpreted as threats by the responsible city officers that this advanced schedule would not be permitted, but that continued operation at lesser and allegedly confiscatory rates would be compelled by the city by whatever forceful means it might choose to adopt.

Thereupon, the company filed, in this pending Doherty Case, a pleading which it entitled, "Second Amendment and Second Supplement of the Toledo Railways & Light Company to its Amended Cross-bill." Therein it alleged, generally, all the facts which we have recited, and claimed that even its proposed advanced rates would bring it less than a reasonable return upon the value of its property devoted to street railway uses, and hence that any impairment of those rates would be confiscatory.. It asked that the city be enjoined from preventing, by threats or force or any unlawful action, the inauguration and use of the new schedule. The motion for such an injunction was heard upon this pleading and affidavits in support thereof, upon the answer of the city, upon proofs taken in open court and recitals and statements made by the court and counsel, and accepted by all in the place of proofs. As a result of the hearing, a temporary injunction was granted. The order recited that the proofs established justifiable apprehension on the part of the street railway company that the city would attempt control and domination of the street railway company in its transportation service otherwise than by legislation within the power of the city to enact, and would produce irreparable damage by causing controversies with citizens respecting the company's right to collect reasonable rates; that a strong probability existed of the necessity of an injunction to protect the company in the exercise of its right to collect reasonable fares, which injunction should continue in force until modified by the court or until the same should be rendered unnecessary by legislation by the city fixing terms and conditions which would bring to the company the return upon its investment required by law. The order thereupon proceeded, restraining the city of Toledo, and all others acting for or with it, "from preventing or attempting to prevent or in any manner interfering with or obstructing the collection by the Toledo Railways & Light Company from and after the date hereof, of fares for transportation upon its street car system at the rate of [the new schedule] * * * from enforcing or attempting to enforce the operation of street cars * * * at any lower rates of fare than that hereinafter set forth * * * from proceeding in any manner to interfere with or take from defendant * * * the control and operation or managment of the street railway system * * * while said defendant * * * is itself actually engaged in the operation of its said street railway system. Provided, that nothing in this order shall be construed as designed to prevent or restrain in any manner the appropriate action of the legislative authority of the defendant, the city of Toledo, to determine the conditions upon which the defendant, the Toledo Railways & Light Company, may continue to use the streets of the defendant, the city of Toledo, in the operation of its street railways for the benefit of the public of such city of Toledo, nor to restrain or prevent said defendant, the city of Toledo, from enforcing such proper and lawful conditions for the aforesaid use of the streets of said city of Toledo, as such city of Toledo might hereafter ordain and establish. Provided, further, that nothing herein contained shall be construed to waive the

jurisdiction of this court to examine and determine at the instance of defendant, the Toledo Railways & Light Company, its successors and assigns, or any other person or corporation, in this cause or in any appropriate proceeding hereafter begun, the lawfulness or reasonableness of any action taken or to be taken by the city of Toledo in attempting to determine or enforce the conditions for the aforesaid use of the streets of the city of Toledo by the defendant, the Toledo Railways & Light Company."

Ralph Emery, Director of Law, and Cornell Schreiber, both of Toledo, Ohio, for appellant.

George D. Welles, of Toledo, Ohio, for appellees.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1] 1. Upon this record, and in this court, the city does not undertake to dispute the claim of the company that any rates of fare, less than the proposed new schedule, would have been confiscatory, and, if enforced against the company, would have been a taking of its property without justification and would violate its constitutional rights. One of the assignments of error challenges this claim, but it is not argued. Moreover, the city took no proof on this issue and contented itself in the court below with criticisms upon the sufficiency of the company's proofs—criticisms which we think not sound (and see note 6, infra). By the line of decisions of the Supreme Court, culminating in the Denver Water Co. Case, 246 U. S. 178, 38 Sup. Ct. 278, 62 L. Ed. 649, and the Detroit Railway Co. Case, 248 U. S. 429, 39 Sup. Ct. 151, 63 L. Ed. 341, it is now clearly settled that, when the franchise rights of a public service corporation to use the streets of a city expire, the city has the absolute right to order the discontinuance of the service and the removal of the property from the streets; that the company has a corresponding right to make such discontinuance and removal;[1] but that if neither party exercises this right, and if the company, at the city's request, continues to occupy the streets and to give service, the public regulatory power can be exercised only subject to the condition that it must not bring about confiscation. Every controversy of this kind must now be viewed in the light of these settled principles; and, if the city's insistence that the property shall remain devoted to public use were not sufficiently to be inferred from the general situation, it would be expressly found in the city's 1916 application in this cause. In the general principles involved, this case is not distinguishable from the Denver and Detroit Cases.

[2] 2. Of course, an injunction should not be issued except where there is reasonable ground to apprehend that the defendant will act unlawfully unless enjoined. Whether there is such reasonable apprehension presents, in every case, a question of fact. Where the trial court has seen and heard the witnesses, we are always reluctant to set aside its finding of fact; and especially must that be true where the

[1] Doubtless reasonable regulations as to manner of removal may be imposed or demanded, and, though it is not clear how the company's right can be any less absolute than the city's (Cleveland Case, 204 U. S. 116, 27 Sup. Ct. 202, 51 L. Ed. 399), it is not here necessary to consider whether there may be cases where an arbitrary and unreasonable discontinuance of service would not be permitted.

rightfulness of the conclusion depends largely upon that general knowledge possessed by all citizens of the community, including the judge, and which cannot be reproduced in the printed record. What action the city, through its official representatives, was likely to take, could be determined by the trial judge much better than by us, and, upon a review of the proofs and the arguments here, we see no occasion to disturb his conclusion. We reach this result with the more confidence because the case is one of those where, if the defendant did not intend any unlawful act an injunction would do it no harm, save as a matter of costs and save as to its abstract right to immunity from unnecessary writs. Neither of these exceptions is vital—although each is important, and the second may be sometimes controlling.

We cannot yield to the suggestion that if the mayor had any intent to interfere with, or obstruct the adoption of, the new schedule, he was going to do so as an individual, and not as mayor. The charter of Toledo is such that the mayor dominates the entire executive machinery. He directs the conduct of the police force as fully as he cares to do so, and whatever appprehension rightly existed had reference to the active or passive conduct of the police force or to some actual taking over or control of the entire system by, or at the instance of, the city or the mayor, as mayor.

3. The court below did nothing which interferes in the slightest with the legislative power of the city.[2] It has the right at any moment to require the company to vacate the streets, remove its rails, and to prescribe reasonable regulations and conditions for such removal. It has the right to give this direction either simply or compounded with an alternative. It may say: "Here are our terms; accept and comply with them or get off." It cannot say: "Because you remain and furnish service by our wish and to meet our needs, you are subject to any arbitrary conditions which we may impose." The order contains nothing inconsistent with this right of the city. The city does not claim that it wishes the streets vacated, nor that any action by it was intended to present to the company the alternative of accepting or getting off. In the Denver and Detroit Cases, the substantial difference between the majority and the minority of the court seems to have been as to whether the city had in fact offered such a choice to the company; here, there can be no difference of opinion on that point.[3]

[2] All seem to assume that ample legislative power has been delegated by the state to the city, and we accept that assumption.

[3] The court below said: "The right of the city to eject the company cannot be questioned in any court. * * * If the city attempts to fix the rate of fare, it can only enforce such rates upon it by coupling therewith the alternative order that otherwise the company cease to do business. * * * It is the business of the city to pursue one of two alternatives: To say to this company, 'Quit running your cars and get off,' or say to this company, 'You will not be interfered with if you charge a rate of fare sufficient to pay * * * [net] six per cent.' * * * This court decided * * * that the company could reject unreasonable terms and at the same time continue its service with the expectation of getting proper compensation * * * until the city affirmatively directed the company to leave the streets as an alternative to the acceptance of the unreasonable terms. * * * [The order will] leave the

Nor does the order impair in the least the city's right to pass an ordinance fixing rates. Repeated statements by the court, if not the express proviso to this effect in the order, should make this clear; indeed, nothing is pointed out to support the stated apprehension that the city council might be in contempt if it attempted to fix rates, save the fact that the proviso permits only "appropriate" action by the council. This word does not nullify that proviso. The council never had any right to pass a confiscatory ordinance, and we see in the word "appropriate" no implication of any limitation except that which exists by law. It is clear to us that, without embarrassment from this order, the city council may proceed at any time, and from time to time, to fix what it regards as reasonable rates of fare, and that these must be observed by the company unless it shall be decided by competent judicial authority, provisionally or finally and according to established practice, that they will operate with confiscatory effect.[4]

[3] 4. The record suggests two bases for the jurisdiction of the court below. They are: First, that the proceedings are ancillary to, and dependent upon, the original Doherty judgment creditors' bill, and therefore supported by the diverse citizenship which there appeared; and, second, that the pleading filed by the company, and which was the immediate basis of the present proceeding, independently gives jurisdiction because it presents a question arising under the Constitution of the United States.

The judgment creditors' bill filed against the company, and, by amendment, against the city and the company, clearly presented a sufficent case of diverse citizenship. All the plaintiffs were citizens of New York and both defendants were citizens of Ohio. The only impeaching suggestion is that the bill was collusively filed. It appeared that Doherty & Co. owned the controlling interest in, and actually dominated, a corporation known as the Cities' Service Company, and that the Cities' Service Company owned and controlled the defendant company; but the utmost that can be inferred from this relationship is that the defendant company would do whatever Doherty & Co. desired, and would do nothing else; and, to state this result in the strongest terms and apply it to this situation, is to say that the bill was filed in the court below with the consent of the defendant company, or even to say that Doherty & Co. and the defendant company agreed that it should be so filed, as the best move for the interests of both. If this constituted that collusion which is fatal to jurisdiction on the ground of citizenship, the court should not have entertained this bill nor any ancillary proceeding solely dependent thereon; but while it does indicate "collusion," in the vague sense in which that word is sometimes used, we think the law is clear that, unless there is something more, a District Court of the United States should entertain a case so presented.

It is settled for this court (and we do not mean to intimate any

company free to apply to the court for relief against unreasonable legislation, unless the city authorities are brave enough to couple with unreasonable provisions of its legislation a specific alternative that the company must accept them or quit the streets."

[4] In this opinion we use "confiscatory" and "giving less than a reasonable return" as entirely equivalent terms.

doubt elsewhere), by our decision in City of Holland v. Holland Gas Co., Feb. 13, 1919, 257 Fed. 679, —— C. C. A. ——, that there is, in such a case, no such merger of identity between the controlling stockholder and the controlled corporation as prevents the former from pursuing, in good faith as a stranger could, any ordinary legal remedy against the latter; and so the question of collusion here becomes —save as to degree of proof and as to mere color—the same as if between strangers carrying out their common understanding. It is necessarily to be deduced from, if not expressly ruled in, Blair v. Chicago, 201 U. S. 400, 448, 26 Sup. Ct. 427, 50 L. Ed. 801; Chicago v. Mills, 204 U. S. 321, 330, 27 Sup. Ct. 286, 51 L. Ed. 504; Re Metropolitan Receivership, 208 U. S. 90, 110, 28 Sup. Ct. 219, 52 L. Ed. 403, and see opinion of Judge Lacombe (Pennsylvania Steel Co. et al. v. New York City Ry. Co. [C. C.] 157 Fed. 440, 444); and Wheeler v. Denver, 229 U. S. 342, 350, 33 Sup. Ct. 842, 57 L. Ed. 1219—that a nonresident plaintiff has an absolute right to pursue, in a federal court, all his remedies against a resident defendant, and it makes no difference what his motive may be in electing the federal remedy. He may do so expressly because he wishes to keep the litigation out of the state courts; that is his constitutional right. See, also, Cowles v. Mercer Co., 74 U. S. (7 Wall.) 118, 122, 19 L. Ed. 86. So, it is wholly immaterial whether the defendant, in acquiescing in the plans for a federal forum, is inspired by the same motives. If the consent of the defendant were important to the jurisdiction, that would be another question; but, where the plaintiff's right to choose that forum is absolute and defendant's opposition cannot impair it, no more can defendant's consent do any harm.

Cases where plaintiff's right to sue depends on the Ninety-Fourth Equity Rule (New Rules, 27) are of the consent class just mentioned. Certain good-faith action by the corporation is an essential preliminary, and it might be impossible to say that a company controlled by plaintiff had, in good faith, refused plaintiff's request; but that is not this case. See Iron Moulders v. Niles Co. (C. C. A. 6, opinion filed Nov. 6, 1918) 258 Fed. 408, —— C. C. A. ——. The suit is not upon a claim assigned by a resident assignor, who continues the real party in interest, as in Miller & Lux v. East Side Canal & Irrigation Co., 211 U. S. 293, 29 Sup. Ct. 111, 53 L. Ed. 189; nor is it a colorable rearrangement of parties, as in Dawson v. Columbus Co., 197 U. S. 178, 25 Sup. Ct. 420, 49 L. Ed. 713.

[4] We conclude, therefore, that the jurisdiction to entertain the bill as first amended and to appoint a receiver for all the property of the defendant company, and, if necessary, to operate the property temporarily through a receivership, was clear and certain; but, as we follow its history, we see that the conduct of the parties tended towards an abandonment of the case. No actual effort was made by plaintiff to get a receiver, and no step was taken towards a final decree. The court would not permit a case of this kind to lie dormant with the consent of everybody, indefinitely, and then allow it to be used by one party, against the objection of the other, as a basis for exercising power that would not otherwise exist. No precise limits of time can be fixed by general statement, but it is clear that the party making such

objection would, in any case where there had been long delay, have strong reason for asking the court to say that the appeal to its limited jurisdiction had served its purpose and was abandoned; but certainly mere unexplained inaction for a year and a half does not, ipso facto, destroy the power of the court to proceed when both parties consent. That is what happened here, for in April, 1916, the city proceeded, in this case, upon the theory that the court had taken jurisdiction between the parties and constructive possession of the res—the property of the street railway company.[5] The city asked the exercise of that jurisdiction by the appointment of a receiver to protect its interests. Of course, jurisdiction cannot be conferred upon a District Court by consent, but that principle is not involved. The city was waiving, instead of insisting upon, its possible right to claim that the once vested jurisdiction should be no longer exercised.

[5] If a receiver had been appointed by the court below, in 1916, and had still been in control and management of the property, it would be clear that the present proceeding was ancillary and dependent; and we do not see that the situation is materially different. Any delay by the city in prosecuting its motion for a receiver to final decision, which delay is short of abandonment, only affects discretionary powers. It does not take away all power. The record shows that the court concluded to appoint a receiver, and was about to make the order when the parties agreed upon an arrangement which was to be, in an essential part, carried out, and ever since has been carried out under the orders of the court from time to time, which arrangement was a substitute for a receiver, and made the actual appointment of a receiver unnecessary for the time being. In a fair and substantial sense, there was a pro tanto receivership, and the application for a general receivership had been argued and submitted to the court and remained undecided; and that such a situation gives to the court constructive possession of the property is established. Farmers' Co. v. Lake Co., 177 U. S. 51, 61, 20 Sup. Ct. 564, 44 L. Ed. 667; and see Prout v. Starr, 188 U. S. 537, 544, 23 Sup. Ct. 398, 47 L. Ed. 584; Ex parte Young, 209 U. S. 123, 161, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764; Rickey Co. v. Miller, 218 U. S. 258, 262, 31 Sup. Ct. 11, 54 L. Ed. 1032. It follows that since this immediate proceeding was brought for the protection of that property from injury and for instructions to the parties as to what they should do, just as it would have been for instructions to the receiver, if the substituted arrangement had not been in force, the jurisdiction of the court below to take the action which it did take must be sustained upon the first ground suggested.

Another view confirms this result. The city asks a receiver. While its petition is pending, and the company has so far escaped the full and general appointment, the city proposes to do acts which will compel the receivership, and then says the court has no power to enjoin such acts. Only in the clearest case could such an objection prevail.

[6] The second ground of jurisdiction is at least equally clear.

---

[5] The city, by its supplemental answer and cross-bill, reserved its protest against the jurisdiction; but this protest referred to its formerly overruled claim of collusion, and not at all to the intervening delay.

Whatever force there may be in the facts stated in this new and supplemental pleading as supporting the jurisdiction of the court below cannot be lost merely because the pleading does not purport to be the commencement of a suit. This new pleading expressly made the city a defendant thereto, and stated facts said to entitle the company to relief, and prayed relief. If the issue so made was justiciable in the court below, it cannot be important whether the pleader considered his petition to be original or dependent.

It seems clear that the facts alleged in this pleading disclosed a proposed taking of the company's property without due process of law. That an attempt to compel a public service company in this situation to give or continue service at a rate which does not permit a reasonable return, is in violation of the company's constitutional right, is not open to question, since the decision in the Denver and Detroit Cases. Even when it turns out that the city is acting lawfully, jurisdiction is given over the whole case, if there is a substantial and good-faith claim of deprivation of constitutional rights. Columbus Co. v. Columbus (S. C. U. S., April 14, 1919) 249 U. S. 399, 39 Sup. Ct. 349, 63 L. Ed. 669. It is true that in the Denver, as also in the Detroit, Case, the city was proceeding to enforce an ordinance; but the ordinance had not been accepted, and was important only as evidencing the city's requirement that the service should be continued. Here, we have the same requirement evidenced both by the city's petition in the cause, and by the mayor's constant insistence that, "whatever happens, the cars will run." In both cases, it was the executive action, not the legislative, that was enjoined. The constitutional prohibitions are not alone against any "law" of the forbidden scope; the Fourteenth Amendment reaches any action, by the representatives of a branch of the state, which unlawfully "deprives" the plaintiff of property rights.

[7] It is also urged that the making of rates for public service is not a judicial function, and that the court has no power to make rates. It is true enough that the direct power of the courts on this subject is negative and not affirmative. Reagan v. Farmers' Co., 154 U. S. 362, 400, 14 Sup. Ct. 1047, 38 L. Ed. 1014. To say that a specified rate is invalid because confiscatory is always to say that any lower rate will also be invalid, and sometimes the facts will be such that, in order to decide whether the rate in question is unlawful, the court must first determine with some accuracy what would be the minimum reasonable return. It is likewise plain that, when an injunction is asked to restrain the enforcement of an unreasonable rate, the court may make its granting conditional upon the doing of equity by plaintiff, and thus may require the plaintiff to consent to charge no more than what seems to the court to be reasonable—just as, in tax injunction cases, the plaintiff is often required to pay what the court thinks a fair tax before it will give relief against the excessive part. In any of these instances, there is an indirect fixing or determination by the court, but each of these indirect results is fully within the judicial power. In the present case, the findings and the injunction do not affirmatively fix a rate. They are directed only against any rate smaller than the sum named, and stand upon the underlying fact that even this sum will not bring a minimum reasonable return.

[8] It is further urged—though perhaps rather as an objection against right than as against power—that the court should have made no order until after there had been a trial period at the rate which the city was willing to approve, according to the precedent set by Willcox v. Consolidated Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034, and Knoxville v. Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371. Those precedents are not applicable. Where a proposed reduction in the current rate is involved, there is an increase of custom to be anticipated, which, with some other elements of uncertainty, tends to neutralize the diminution of income otherwise resulting from the reduction. In this case, the trial period had occurred. The existing rate had been in force two years and had proved to be insufficient. It was proposed to increase the rate to meet new and increased expenses, and it was certain that the increased rate would tend to diminish the custom; but the computations were made on the basis of the number riding during the four months' period then ending, and without scaling down (except on transfers) on account of the inevitable loss of travel which would ensue when the price was put up. Hence, we see no reason why it was incumbent on the court below to require a trial period of operation under the partial advance which the city was willing to concede, before permitting the full advance which appeared to be necessary.[6] It may be added that a year of operation under the high rate

[6] After finding that the value of the property upon which a return should be computed was probably much more than $8,000,000, and that financial conditions in Toledo were the same as those found in the Denver Case, and hence that the net return should be at least $480,000, the court below continued:

"It seems certain that the very best that can be said for the city, under any circumstances, is to say this, and it is the clear indication of the evidence before us that a fare of five cents, with a one cent charge for transfer, will, under present circumstances, not pay the company's operating expenses enhanced by an increase of wages, and even this surplus. Indeed, the city, if we may judge from the character of its argument to the court, is not seriously combating this proposition. It does not argue anywhere in its brief that this rate is exorbitant. All the city now contends for is to try some lower rate of fare by way of experiment and see what the result will be, although all the evidence before this court indicates most clearly that the mayor's proposition of eleven tickets for fifty cents, with free transfers, will not meet what is due the company.

"We are unable to see any right in the mayor to ask the company to submit to an experiment which present conditions show will be a losing one. From his testimony and the arguments submitted in behalf of the city, it does not appear that he had any confidence that this rate was adequate, for he says that, in fixing upon it, he was moved by the theory that the car rider, the carmen, and the car company each must sacrifice something in the present emergency. But the mayor of Toledo has no right to demand of this franchiseless company that it render service to the city at a sacrifice, nor has he the right to say to the employés of the company that they must work for less wages than their services are fairly worth. He ignores the fact that it is no sacrifice for the car riders of the city to pay any rate of fare which is what the service to them actually costs, and the economic truths that they should pay what the service to them costs, that the car men are entitled to a reasonable wage, and that the car company is entitled to a compensation which will allow it to live. No one has the right, whether an official or not, to ask either the carmen or the car company to make 'sacrifices' that the car riders may get service for less than cost, and, of course, the court can listen to no such proposition as that to support an insistence that an inadequate rate should be imposed."

has now passed, and there has been no claim made that it was turning out to be more than necessary.

From these views, it follows that the order appealed from should be affirmed.