### MONROE GASLIGHT & FUEL CO. v. MICHIGAN PUBLIC UTILITIES COMMISSION et al.

(District Court, E. D. Michigan.   June 9, 1923.)

1. Gas ⬤⇒14(1)—Reproduction cost when unimpeached is dominating element in fixing rate base.

   Reproduction cost of gas company's plant, when not impeached or attacked, is dominating element in fixing of rate base, and, if Public Utilities Commission fails to give it that dominating effect, there is error of law which court must correct in suit for injunction.

2. Gas ⬤⇒14(1)—Statement by Public Utilities Commission as to consideration of different elements cannot prevail over contrary inference from the proofs.

   In suit to enjoin enforcement of gas rates fixed by Public Utilities Commission, the court must determine rate base from the evidence before it and is not precluded from such determination by statement of the Commission that it duly considered actual cost, investment, capitalization, reconstruction cost, etc., when proofs justify contrary inference.

3. Gas ⬤⇒14(1)—Preliminary injunction against rates granted when there is reasonable probability that plaintiff will prevail and consumers can be protected.

   In suit by gas company to enjoin enforcement of rates fixed by Public Utilities Commission when there is reasonable probability that it will prevail upon final hearing and consumers can be effectively protected against substantial loss, if final result is in favor of lower rate, preliminary injunction should be granted, notwithstanding probability that final hearing may be had within short time.

4. Injunction ⬤⇒137(1)—Prompt final hearing does not preclude preliminary injunction.

   Preliminary injunction, sought pursuant to section 266, Judicial Code (Comp. St. § 1243), should not be denied merely because a final hearing may be had promptly.

5. Gas ⬤⇒14(1)—Preliminary injunction against gas rates not denied because of Commission's intention to allow amortization if rate found too low.

   Injunction against gas rates fixed by Public Utilities Commission to which gas company is otherwise entitled will not be denied because Commission announces that, if rate is later found noncompensatory, it will permit loss to be amortized through a later rate.

6. Courts ⬤⇒508(1)—Suit to enjoin gas rates permissible instead of appealing to state courts.

   As power of Michigan state courts in reviewing action of Public Utilities Commission in fixing gas rates is judicial and not legislative, suit for injunction in federal court under Const. Amend. 14, is permissible alternative remedy.

---

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. Gas ⟹14(1)—**Retirement reserve not to be deducted in valuing property.**
In valuing property of gas company to fix rate base, retirement reserve carried on its books and not representing fund on hand, but only bookkeeping estimate of depreciation, and, if correct, representing accurately the actual difference between present value of depreciated items and future costs of replacements, should not be deducted, in addition to a proper deduction, under the evidence, for the same purpose.

8. Gas ⟹14(1)—**Past high profits not obstacle to injunction against noncompensatory rate.**
Past high profits received by gas company, under contract or under public supervision, form no obstacle to enjoining later noncompensatory rate, whether paid out in dividends and reinvested or directly reinvested.

9. Gas ⟹14(1)—**Overhead construction costs to be considered in valuing plant.**
In valuing plant of gas company for purpose of fixing rate base, construction overhead costs, such as interest and taxes during construction, contractor's profits, and undistributed costs, are to be considered as part of fair value of the plant.

10. Gas ⟹14(1)—**Commission without right to base finding on evidence or documents not called to party's attention.**
In proceeding before Public Utilities Commission to fix gas rates, the Commission had no right to base finding that engineer's allowance for overhead construction costs was too high on evidence or documents in other cases or in its files without calling them to attention of the gas company to give it a chance to be heard.

11. Gas ⟹14(1)—**Not assumed without evidence that reproduction costs would be less than average cost for five years preceding.**
In suit to enjoin gas rates fixed by Public Utilities Commission, it cannot be assumed without evidence that reproduction cost on January 1, 1923, would be less than that shown by evidence as average cost for five years preceding that date.

12. Gas ⟹14(1)—**Commission may consider future increase or decrease in costs but not without evidence.**
In valuing gas company's plant for purpose of fixing rate base, Public Utilities Commission is not absolutely controlled by reproduction cost at the time but may give weight to evidence, if any, warranting reasonable conclusion that average cost during period for which rates will probably stand will be higher or lower, but cannot do so without any evidence on the subject.

13. Gas ⟹14(1)—**Entitled to reasonable return on proper base irrespective of securities outstanding.**
Gas company is entitled to opportunity to earn reasonable minimum return upon proper rate base, and it is immaterial how many stocks and bonds are outstanding.

14. Gas ⟹14(1)—**That company operating at sufferance cannot affect permissible rate.**
That gas company is operating by sufferance of city cannot affect minimum rate constitutionally permissible.

15. Gas ⟹14(1)—**Rate held confiscatory because allowing too small return.**
Gas rates fixed by Public Utilities Commission which would allow only 5⅙ per cent. upon proper rate base *held* confiscatory.

16. Gas ⟹14(1)—**Court cannot fix rate, but can only determine whether rate is confiscatory.**
In suit to enjoin gas rates, the court cannot fix the rate directly or indirectly, but is concerned only with question whether rate fixed is confiscatory, and, if it is, will issue injunction.

17. **Gas ⬥14(1)—Injunction may be made conditional upon voluntary abatement by gas company, but return held not so high as to require such condition.**

While, in suit to enjoin gas rates fixed by Public Utilities Commission, if it appears that rate otherwise chargeable is excessive to extent of being above value of service and above any reasonable maximum, court could make injunction conditional upon suitable voluntary abatement by the company, rates allowing less than 9 per cent., which may be subject to substantial reduction upon adjustment of matters in dispute, does not require such voluntary abatement.

18. **Gas ⬥14(1)—Injunction against rate held to leave matter open before Utilities Commission.**

Injunction restraining enforcement of gas rates fixed by Michigan Public Utilities Commission on application joined in by the gas company and the city *held* to leave the matter open before the Commission and to leave it free to proceed to hold further hearings and make further final order unaffected by the injunction except by its direct effect.

19. **Gas ⬥14(1)—Bond held to be required as condition of preliminary injunction restraining enforcement of gas rate.**

Under Clayton Act, § 18 (Comp. St. § 1243b), preliminary injunction restraining enforcement of gas rates fixed by Public Utilities Commission will be made conditional upon giving of bond for refund if rate is ultimately determined to be a lawful rate, where the amount involved as between such rate and that otherwise chargeable is about $1,000 a month.

20. **Courts ⬥101—Local district judge may approve bond and issue injunction granted by three judges.**

Memorandum opinion by three judges under Judicial Code, § 266 (Comp. St. § 1243), being on file, it is proper for local district judge acting alone to approve bond therein required and issue injunction thereby authorized.

In Equity. Suit by the Monroe Gaslight & Fuel Company against the Michigan Public Utilities Commission and others. On motion for preliminary injunction. Injunction granted.

Beaumont, Smith & Harris, of Detroit, Mich., for plaintiff.

Andrew B. Dougherty, Atty. Gen., for defendants.

Motion for preliminary injunction, heard under section 266 of the Judicial Code (Comp. St. § 1243), before DENISON, Circuit Judge, and TUTTLE and SIMONS, District Judges.

PER CURIAM. The franchise contract rates of the Utility expired. The city and the Utility joined in an application to the Commission to fix rates for gas. In February, 1922, the Commission fixed an interim rate, averaging about $1.76 per M, to continue pending hearings. After extensive consideration, and in April, 1923, it made its final order, fixing on a sliding scale rates at what is said to be an average of $1.54. The bill in this cause alleges that this rate is confiscatory, in violation of the Fourteenth Amendment, and prays an injunction. A restraining order was made, to have effect until the motion could be heard, and the interim rates have therefore continued.

[1] The disposition of this motion is to be determined by the interpretation and effect given to the Southwestern Bell, the Bluefield Water, and the Georgia Power Cases, recently decided by the Supreme

Court. They constitute the last word upon the theory and practice involved in fixing a rate base for public utilities,[1] as to which there has been a long-time controversy between historical cost, or actual cost, or prudent investment (less depreciation), upon the one side, and reproduction cost (less depreciation), upon the other.

We have considered the application of all these cases, but have not always referred to them. In the end, Mr. Justice Brandeis' forceful dissenting opinion in the Southwestern Bell Case may or may not prevail;[2] but at present the majority opinion is to be accepted and followed, with all necessary implications from the result which it reaches. The Missouri Commission had fixed the rate base at $20,400,000. The steps by which it had reached this result were not very clear, but it apparently had given slight, if any, regard to reproduction cost. The evidence before the court offered by the Utility showed the reproduction cost of the physical property, less depreciation, to be $24,700,000, the necessary working capital to be $1,050,000, and the cost of establishing the business to be $5,600,000. This made a total of $25,750,-000 of physical property and working capital. It appeared that the Commission had thought proper to deduct $500,000 from the physical property for that which was not used or useful, and to make some deduction from the working capital. It seems probable that, for the purposes of the opinion but without any decision thereon, the court excluded the cost of establishing the business; and then, upon the state of proof which we have recited, it says:

"We think the proof shows that for the purposes of the present case the valuation should be at least $25,000,000."

Particularly when we read the dissenting opinion, we must construe the majority opinion as the minority of the court interpreted it, viz., as holding that, where it stands not impeached or attacked other-

---

[1] The line of Supreme Court cases, touching this subject, within the last year or so, comprises: Newton v. Consolidated Gas Co., 258 U. S. 165, 42 Sup. Ct. 264, 66 L. Ed. 538; Oklahoma Natural Gas Co. v. Oklahoma, 258 U. S. 234, 42 Sup. Ct. 287, 66 L. Ed. 590; Galveston Electric Co. v. Galveston, 258 U. S. 388, 42 Sup. Ct. 351, 66 L. Ed. 678; Houston v. Southwestern Bell Co., 259 U. S. 318, 42 Sup. Ct. 486, 66 L. Ed. 961; Wichita R. R. & Light Co. v. Kansas Commission, 260 U. S. 48, 43 Sup. Ct. 51, 67 L. Ed. 124; Oklahoma Gas Co. v. Commission (March 5, 1923) 261 U. S. 290, 43 Sup. Ct. 353, 67 L. Ed. ——; Keller v. Potomac Co. (April 9, 1923) 261 U. S. 428, 43 Sup. Ct. 445, 67 L. Ed. ——; Prendergast v. New York Telephone Co. (April 16, 1923) 43 Sup. Ct. 466, 67 L. Ed. ——; Southwestern Bell Co. v. Missouri Commission (May 21, 1923) 43 Sup. Ct. 544, 67 L. Ed. ——; Brush Electric Co. v. Galveston (June 4, 1923) 43 Sup. Ct. 606, 67 L. Ed. ——; Bluefield Water Co. v. W. Va. Com. (June 11, 1923) 43 Sup. Ct. 675, 67 L. Ed. ——; Georgia Power Co. v. Georgia Commission (June 11, 1923) 43 Sup. Ct. 680, 67 L. Ed. ——.

[2] We can contribute to the discussion only a reference to the contention of some economists that an increase of 100 per cent. in reproduction costs indicates that the dollar of return has lost 50 per cent. of its purchasing power, so that to maintain the same actual return either the rate base, or the rate of return, or both, must be increased. It must further be noted that rate fixing involves three main elements—the rate base, the proper rate of return, and the operating cost. It is easy to "stabilize" the rate base by adopting the "prudent investment" theory, but the other two elements must remain unstable and fluctuating.

wise than it was in that case, the reproduction cost is the dominating element in the fixing of the rate base; and if a Commission, which leaves it substantially unimpeached, fails to give it that dominating effect, there is an error of law which the court must correct. The opinion in the Bluefield Water Case tends to confirm this construction of the Southwestern Bell Case. The rate base made by the Commission was set aside because due regard had not been given to reproduction cost. The court did not undertake to say just what "proper consideration" would be. It did not think that the circumstances called upon it to say, as it did in the Southwestern Bell Case, what the minimum permissible valuation was. Possibly this was for the reason that the appeal was from the state court, and the state court had so obviously adopted the theory of historical costs that to correct that error in general terms was thought sufficient.

Nor do we find anything inconsistent with this view in the opinion in the Georgia Power Case. It affirms only that the reproduction cost at the date of the inquiry is not necessarily controlling. The reproduction valuation was made at the end of 1921—about the peak of high costs. The company claimed this value to be $9,500,000. The Commission cut off $4,250,000. $2,000,000, which the company included, was for items obviously improper. About $500,000 was cut off from two items, upon findings which the court approved. This left the company's valuation of physical property as $7,000,000. It appeared that at the time of the trial court hearing construction costs were reduced, and that the court below had allowed some increases in the value of the property and had given careful attention to the whole matter of reproduction value. The true amount of accrued depreciation, the amount of fall in costs before the hearing, and of the other respects in which the company's valuation was attacked, do not appear. Comparison of the majority and minority opinions makes it clear that the majority did not think it was departing from the principle of the Southwestern Bell decision, but rather was adhering thereto.

[2] It is plain from its exhaustive report that the Michigan Commission in this case followed practically in the lines of Mr. Justice Brandeis' dissenting opinion in the Southwestern Bell Case; and it will, of course, be noted that the action of the Commission was taken some time before this opinion was announced. The report of the Michigan Commission is most painstaking and thorough, and displays obvious intent to deal fairly with the Utility—according to the Commission's view of the legal questions involved—in a degree which unfortunately has been absent in some cases in which judicial review of Commission conclusions in other states has been sought. It will be noted, however, that, pursuant to a common practice, the report seeks to immunize itself against attack by a careful declaration that no one element is given controlling effect in fixing the rate base, but that actual cost, investment, capitalization, reconstruction cost, depreciation, etc., are given, and each is given, due weight in reaching the final composite conclusion. As Mr. Justice Brandeis points out, such a report, like the general verdict of a jury, suggests immunity to any attack which depends upon showing that the Commission gave excessive or insufficient force to any

one element. We do not see that an otherwise appropriate judicial revision can be escaped in this manner. It is the duty of the court to determine the rate base from the evidence before it; and while there must be great hesitancy in overturning a conclusion reached by the Commission, after it has considered all relevant facts, neither presumption nor express statement by the Commission that it has given due weight to every one can prevail against a contrary inference required by the proofs.[3]

[3] So much for the method by which a rate base must be fixed. The Michigan Commission in this case fixed the base, considered the other necessary elements, determined what the proper return should be and what the actual return probably would be, and fixed the rate schedule accordingly. The Utility says that the rate so fixed is confiscatory. This the Commission denies. Upon what principle should we proceed in granting or withholding a preliminary injunction? It may be that only a short time would elapse before there could properly be a final hearing; but there can be no certainty of that. Unexpected difficulties might arise in taking proofs or in reaching a final hearing in this court. Certainly there may be substantial delay. In such a situation the applicable principle was stated by the Court of Appeals of this circuit in Louisville v. Louisville Telephone Co., 279 Fed. 949, as follows (pages 956–959):

"It is equally well understood that the trial court will balance the conflicting equities of the parties, and, if it appears reasonably probable that plaintiff may prevail upon the final hearing, will for the time being preserve plaintiff's supposed right against destruction, if that temporary maintenance can be accomplished without danger of greater harm to defendant than there will be of benefit to plaintiffs. We see no sufficient reasons why these principles should not be applied to such a case as this; but we proceed to notice the reasons which are alleged to the contrary. * * * It is also said that the rate ordinance is a law of the state, within the meaning of that term as used in the Fourteenth Amendment, and that the company is attacking it because in violation of that amendment, and therefore has the burden of showing that a state law is unconstitutional, which burden can be met only by evidence that is wholly convincing. The proposition in effect is that, when plaintiff claims it is about to be deprived of its property by an unconstitutional law, it cannot have the benefit of the usual rule for temporary protection while the case is pending, but that it must at the outset establish its case by the same degree of demonstration which will be required upon the final hearing. If the unconstitutionality depends wholly upon a matter of law this proposition is forceful; but, where the result depends upon a disputed question of fact, we think there must be some special circumstances—perhaps like the contingent public loss inevitable in a railway rate case—to

<hr>

[3] It is not impossible that the Supreme Court has, in effect, yielded to the force of what was said by Judge Learned Hand, in the Consolidated Gas Case (D. C.) 267 Fed. at pages 236, 237: "With deference, it appears to me to be merely an abandonment of any attempt to deal intelligibly with the question to say that cost of reproduction and the original cost are each elements to be considered. That statement can mean nothing whatever, unless it is accompanied by a constructive rule, which will establish some standard in the ascertainment of which these may be used. It would be understandable to say that the two estimates should be averaged, but such a rule could obviously command no support, because it would correspond to no relevant considerations of policy. Merely to leave the question with a caution that several elements are to be considered is to abandon any effort to solve it." See Bluefield Water Case, 43 Sup. Ct. 675, 67 L. Ed. ——.

justify refusing the plaintiff the benefit of the usual presumption that upon the final hearing he may be able to establish his claims with sufficient certainty."

The same principle has more recently been announced by the Supreme Court in the case of Prendergast v. New York Telephone Co., 43 Sup. Ct. 466, 67 L. Ed. —— (April 16, 1923), as follows:

"*  *  * Especially will the granting of the temporary writ be upheld, when the balance of injury as between the parties favors its issue. (City of Amarillo v. Southwestern Telephone Co. (C. C. A.) 253 Fed. 638, 640. Here the Commission had prescribed temporary rates which were found to be confiscatory, which were to continue in effect pending the final determination of the Commission after its investigation had been completed; and no date had been fixed for the completion of this investigation or the final hearing. The company meanwhile could only be protected from loss by injunction; while, on the other hand, its subscribers were protected by the bond which was required for the return of the excess charges collected if the injunction should be thereafter dissolved."

These decisions require that a preliminary injunction should issue, if there is reasonable probability that the Utility will prevail upon a final hearing, and if the consumers can be effectively protected against a substantial loss if the final result is in favor of the lower rate.

[4] Beyond that, it would seem that in cases heard under section 266, it would be peculiarly inappropriate to refuse a preliminary injunction on the ground that a final hearing could soon be had. The effect of that procedure would be to deny to both parties any right to have the merits of the application heard by the special court which section 266 creates for that purpose and which is the right of the plaintiff as well as of the defendant (Ex parte Metropolitan Co., 220 U. S. 539, 31 Sup. Ct. 600, 55 L. Ed. 575), and to pass all questions over to the decision of the single district judge upon the final hearing.

[5] If a preliminary injunction otherwise should issue, we cannot rightfully deny it just because the Commission announces that, if this rate shall finally be found noncompensatory, it will permit the loss to be amortized through a later rate. This policy is thoroughly fair, and is to be commended; but this Commission is under no legal duty to take that course, and its intentions or its personnel may change. When the court sees a case of week by week and month by month continuance of confiscation, even if each monthly loss is small, the plaintiff is entitled to his injunction without waiting for possible future relief, unless for reasons not here present. See Pendergast v. New York Telephone Co. and Oklahoma Co. v. Commission, supra.

[6] It is suggested, perhaps not strenuously, that the Utility has not exhausted its remedy through appeal to the Michigan courts. Prentis v. Atlantic Coast Line, 211 U. S. 210, 29 Sup. Ct. 67, 53 L. Ed. 150. It was held in Detroit, etc., Co. v. Michigan Ry. Commission (D. C.) 203 Fed. 864, 868; that the statutory power of the Michigan courts in an analogous case was judicial, not legislative. This was affirmed by the Supreme Court of the United States, 240 U. S. 564, 36 Sup. Ct. 424, 60 L. Ed. 802. We are not aware that it has been questioned by the Supreme Court of Michigan. It follows that the statutory appeal, and an application to a federal court under the Fourteenth Amend-

ment, are alternative, elective remedies. Bacon v. Rutland Co., 232 U. S. 134, 34 Sup. Ct. 283, 58 L. Ed. 538; The Prendergast Case, supra.

Turning now to the questions of fact: The engineers of the Commission made a careful inventory and appraisal, and the Commission's auditors thoroughly examined the Utility's books and records. These engineers and accountants found—and there was nothing before the Commission to the contrary—that the historical cost of the physical property on January 1, 1923, was $272,000. By "historical cost" was meant what the books showed the cost to have been, as far as the books went, and what the evidence showed the probable cost was in these respects not shown by the books. They also found that the reasonable cost from time to time, or the prudent investment cost, up to the same date, would be $272,000. They also found that the reproduction cost of the physical property, new, as of January 1, 1923, would be $445,-000. They also estimated and fixed the actual depreciation of the various items or classes, in amounts which in total were $44,000, or about 10 per cent. of the cost, leaving the reproduction cost, less depreciation, of the physical property, as $401,000.

The Commission then, in one part of its report, applied the same percentage of reduction for actual depreciation to the amount of prudent investment cost, stating that this depreciation would be about $26,000. There are intimations that there might be a further depreciation by way of obsolescence or theoretical depreciation, but this is passed over with the statement that there seems to be no occasion for any substantial allowance for obsolescence in addition to actual depreciation. The Commission then stated that in fixing the rate base it would include an allowance "of something like $25,000" for working capital, and that it also made "a proper allowance," the amount of which it did not state, for "going concern value." It then announced its general verdict that the present fair value of the entire property and to be used as a rate base was $275,000. These figures are very persuasive (though perhaps not beyond possible explanation) to the effect that the Commission practically fixed the historical cost, or prudent investment cost, as the rate base, and gave no substantial effect to the reproduction cost, and therefore offended against the rule which must be deduced from the Southwestern Bell Case.

We gather from the report of the Commission and its answer in this case only three suggestions which seem to be thought to weigh against the propriety of the acceptance of the reproduction value, found by the Commission's engineers, and against the conclusion that the Commission did accept and use the "prudent investment" cost, less depreciation and plus working capital, as its rate base. They are: (1) The depreciation account; (2) the construction overheads; (3) the excessively high cost prevailing during the period selected by the engineers as a standard. We will consider these things in their order.

[7, 8] 1. The utility carried upon its books a depreciation account, which (after a correction directed by the Commission), January 1, 1923, amounted to about $37,000. This was called a "retirement reserve." In its answer the Commission says:

"Included in the item of $272,000, above mentioned, was property paid for by the use of the reserve fund, or retirement fund of the utility; a retirement reserve of approximately $39,000 being reinvested in the property."

The Commission does not definitely undertake to deduct this retirement reserve from the present fair value of the property, but there is a suggestion that such deduction might be made. We think this is an entire misapprehension. An account of this kind is not a fund in hand; it is a bookkeeping estimate of depreciation which accrues beyond and above the amount kept good by repairs and replacements. It appears in the list of assets only because it represents a supposed loss of capital (or of accumulations); and if the capital stock is carried as a liability at par, along with undivided profits and surplus, then the depreciation must appear upon the other side of the account. If the bookkeeping estimate is accurately made, it will precisely balance the actual difference between the present value of the depreciated items and the future cost of proper replacements or substitutions. If the estimate is liberally made, there will be a surplus above the true amount of actual depreciation, just as there is here a surplus or difference of about $11,-000 between the Commission's engineer's estimate, as applied to prudent investment cost, and the defendant's books.[4] The existence of such a surplus on the books has little evidential force. It means only that at the rates which have been charged, the company has collected that amount in addition to what now appears to be the true amount of depreciation plus the amount which it has seen fit to pay out in fixed charges and dividends, or carry as surplus and undivided profits. The idea that such a depreciation account or retirement reserve, which grew up through the collection of lawful rates, is some sort of a trust fund in which the rate payers are interested and upon which the Utility has no right to earn a return, which idea has found favor with some Commissions (although the Michigan Commission has not indicated its adherence thereto), is without foundation. The fact that such excess, along with what is called surplus or undivided profits, has been invested in further property, does not deprive the Utility of its full right to earn a return thereon. Past high profits, under a contract or under public supervision, form no obstacle to enjoining a later noncompensatory rate (the Consolidated Gas Case); and it can make no difference whether they have been paid out in dividends and reinvested as additional capital, or have been directly reinvested. We therefore must wholly reject this element of attack upon the valuation, excepting so far as it duplicates the actual depreciation, $26,000 in the prudent investment cost or $44,000 in the reproduction cost.

[9, 10] 2. *Construction Overheads.* Included in the $272,000 stated by the Commissioner's engineers as prudent investment cost was an allowance for construction overheads of about $34,000. This was about 12½ per cent. of the total, or, more accurately stated, an addition to

---

[4] As compared with the same engineers' estimate of depreciation as applied to reproduction costs, the utility's bookkeeping estimate showed a deficiency (about $7,000) instead of a surplus.

labor, material, etc., of about 14 per cent. Upon this subject the Commission says:

"Said amount was, in the opinion of the Commission, far too great. No such overhead costs appeared upon any records of the plaintiff or anybody else, and the Commission was not bound by any such figures."

We, can see no escape from the conclusion that the action of the Commission in this respect was arbitrary. Such overheads as were involved, viz., interest and taxes during construction, contractor's profits, and items which all the witnesses classify as "undistributed costs," are as much a part of the fair value of the plant, considered on any basis, as are the iron and the bricks. The only evidence before the Commission was the report of its own engineers, who, both as to reproduction cost and original cost, made this estimate of about 14 per cent. The only additional evidence before the court is that of the Utility's engineers, who testify that the proper allowance is about 20 per cent. If, perchance, the Commission had in mind evidence or papers in other cases, or general documents in its files which showed that 14 per cent. was too high, it had no right to base its findings on such documents or evidence without calling them to the attention of the Utility and giving it a chance to be heard. U. S. v. B. & O. S. W. Ry., 226 U. S. 14, 33 Sup. Ct. 5, 57 L. Ed. 104; Interstate Commerce Commission v. Louisville & N. R. Co., 227 U. S. 88, 91, 93, 33 Sup. Ct. 185, 57 L. Ed. 431; U. S. v. L. & N. Ry., 235 U. S. 314, 321, 35 Sup. Ct. 113, 59 L. Ed. 245.

Obviously these overhead costs would not appear "upon any records of the plaintiff or anybody else." There was no reason why they should. The Utility's books did not purport to go back and show total actual disbursements for construction. The engineers arrived at their prudent investment cost by computing what labor and material should have cost at the respective dates involved, and there was nothing to indicate that they made the mistake of counting these overheads in again after they had originally estimated for the same things. Therefore we conclude that, at least, that estimate of overheads made by the Commission's engineers must be accepted in arriving at the rate base.

[11] 3. In making their estimate of reproduction cost, the Commission's engineers used as a standard the average of costs during the five-year period, 1917–1921. The Commission assumed, as it rightly could, that the year 1922 had been one of somewhat diminishing costs, and hence that its engineers' basis was too high to use in fixing reproduction costs as of January 1, 1923. There seems to have been no evidence on this subject. We are not sure that any tribunal may judicially assume that the construction costs were less January 1, 1923, than they were during the average of the period 1917–1921; or that judicial knowledge can go further than to say that such costs January 1, 1923, were substantially less than they were at the peak in 1920–21. Whatever inference the Commission might have been authorized to draw, this motion must be decided by this court upon the evidence before it, and aside from the figures of the Commission's engineers, there is no evidence excepting that of the Utility's engineers, who pro-

duced schedules and appraisals which they say are based upon prices prevailing January 1, 1923, and which showed the reproduction costs new (without overheads) to be $377,000, and such cost less actual depreciation to be $332,000. If we compare these figures with those made by the Commission upon the five-year average basis, we find that the Commission's engineers' figures, before depreciation, were $389,000 and after depreciation $351,000 (both omitting overheads). We thus find that the figures given by the Commission's engineers, based as they were, are greater than those shown by the evidence before us to be the true figures as of January 1, 1923, by the respective amounts of $12,000 and $19,000. There is no evidential basis for making a greater allowance for the fall in prices up to 1923.

Differing estimates of actual depreciation cannot be used for the purpose of reducing the Utility's engineers' estimate, because the amount allowed for actual depreciation by each set of engineers is substantially the same; indeed, the Utility's engineers allow a slightly higher percentage.

We think no specific criticism of the Utility's engineers' figures is made, excepting to say that the overhead charges of 20 per cent. are too large. It would seem that we would be giving the benefit of every doubt to the Commission if we took the percentage of overhead allowance made by the Commission's engineers, 14 per cent. instead of the 20 per cent. allowance made by the Utility's engineers. Modification in this respect would cause us to increase the figure of $332,000 substantially $46,000 for overheads making a total of $378,000. We are unable to see how, upon the evidence, any less a figure than $378,000 can be by us taken as the January 1st reproduction cost of physical property.[5]

[12] Obviously and as expressly held in the Georgia Power Case, this reproduction cost at that date is not absolutely controlling. It must be contemplated that a rate fixed by the Commission is to stand for a substantial period. Our Court of Appeals suggested in the Louisville Telephone Case, 279 Fed. 959, that a three-year period was about as short as should be contemplated when a rate is fixed. Clearly the Commission should look forward to such a period; and if there is anything before it from which it may draw a reasonable conclusion that the average cost will be higher or lower than the present cost, it may give due weight to that conclusion—subject, of course, to later correction by it if the future demonstrates an error. But we do not understand that a Commission can make or act upon a finding of this kind, express or implied, unless there has been evidence thereon and the Utility has had the chance to be heard. It is difficult enough in-

[5] Upon the oral testimony of the utility engineers at the motion hearing, the Commission reserved the right to cross-examine, after time for preparation. We have thought it proper to express our opinion on the record as it now stands, in order that the Commission might intelligently determine whether it cared to exercise the reserved right. If it does, a time will be fixed, and due consideration be given to any further proofs thereby developed. We have thought we might save time by contingently assuming that cross-examination would not be thought sufficiently material to justify delay.

telligently to estimate future costs, even with the aid of expert evidence and opinion. We all know that since January 1, 1923, construction costs, instead of continuing to decline, have risen again, and in some respects are now even higher than at the former peak.

It is agreed upon all sides that to the proper valuation of the physical property a suitable allowance for working capital must be made. The evidence before us indicates $30,000 to be a proper sum. The Commission indicated its approval of "something like $25,000." No one has suggested that a lesser amount would be sufficient. If we add this to $378,000 we have $403,000.

There perhaps should be added an allowance for the cost of converting the skeleton plant into a profit-returning body. We find no occasion now to discuss this mooted question. It is not easy to reconcile all the things which the Supreme Court has said on the subject; nor, indeed, to see why, if we are considering present reproduction value and not historical cost, there is difference in principle between value for exchange and value for earning. However, this subject may be postponed until the matter becomes controlling, in this or some other case.

The foregoing considerations demonstrate to us that, if we make some allowance for uncertainties and even for the expectation of lower costs in the immediate future, the Commission was not justified in fixing the rate base at less than $375,000. We do not need to decide at the present moment whether the evidence required any greater valuation.

[13] We reject entirely the whole subject of capitalization, stocks, and bonds. We fail to see how it can have any pertinence. The Utility is entitled to an opportunity to earn a reasonable minimum return upon the proper rate base. How many securities are outstanding is of no importance. Cases may be conceived where the stock and bond history may have evidential value, but its bearing at the best will be remote.

[14] The next element in fixing the rate to be charged is the proper rate of return. The Commission has estimated this at 7 per cent. What rate the court should consider as that minimum below which the Commission cannot go without creating confiscation it is not necessary to decide. The Supreme Court said in the Southwestern Bell Case that a rate of 5⅓ per cent. and in the Bluefields Water Company Case that a rate of 6 per cent. was too low. We do not see anything to justify a lesser rate in this case; indeed, it is evident that the Commission does not wish to stand upon the rightfulness of any rate of return less than the one that it adopted. The fact that the Utility is operating by sufferance of the city cannot affect that minimum rate constitutionally permissible, however much weight it might have in fixing a rate reasonable in an economic sense. Detroit, etc., Co. v. Mich. Ry. Commission, supra; Louisville Telephone Case, 279 Fed. at pages 952, 953, supra); Toledo Case (C. C. A. 6) 259 Fed. 450, 453, 170 C. C. A. 426.

The next element requires us to estimate the future output or volume of business. For this purpose courts have sometimes re-

quired a trial period and sometimes not. There does not seem to be any general rule upon this subject. In the Pendergast Case, the Supreme Court said that the trial period was not necessary. In the Brush-Electric Case, the discretionary conclusion of the trial judge that he could only be satisfied by an actual test was approved. Our Court of Appeals discussed the subject somewhat in the Louisville Telephone Case (279 Fed. at pages 956, 957). In some cases, like railroad or street car travel, a substantial decrease in prices will bring a large increase of business and result in no net loss of income. We see little room for any such presumption in this case. For several years, this company has had a substantially steady output, with little fluctuation on account of changing prices. The price increase in February, 1922, does not seem to have diminished sales. The use of gas for domestic heating and lighting, and where most of the users, as here, take small amounts per month, is not likely to be greatly increased by an average cut of 50 cents on the monthly gas bill. When we take these things under consideration, with the fact that the Commission made its own computations and estimates upon the basis that the consumption would be about 4 per cent. more than in 1922, and would be 60,500,000 feet in 1923, we think there should be no hesitation in forming our conclusions on that basis.

The remaining important element is the estimated future cost of operation.

It is not worth while for the purposes of this motion to go into the several disputed questions arising upon this subject. For our present purposes we accept the estimate and allowances of the Commission that the reasonable costs should be considered as $1.22 per M, including proper allowances for depreciation and reserve, and thus leaving a margin of 32 cents per M upon an estimated output of 60,500,000 to provide for return; the Commission's estimate of the actual average of its new prescribed rates, as applied to the various classes of customers, being $1.54 per M.

[15] It follows that upon the Commission's own figures, the return for the year would be substantially $19,360. This is a little less than 5⅙ per cent. upon the $375,000 rate base, and under the recent express holdings of the Supreme Court, is plainly confiscatory. If we readjust the expectant operating net income upon the Utility's claims as to the actual cost of production and necessary allowance for depreciation reserve, the income would be noncompensatory even upon the $275,000 base; but those questions will be passed by.

Upon the hearing of this motion, the Commission, by affidavits and testimony, made a showing as to the actual income of the Utility for the first four months of 1923, under the interim rates which were in force until April and had been continued by the effect of the restraining order. The suggestion is that these figures show the Utility to be receiving a return unjustly large. A careful comparison and summary of this showing brings the following record:

<div align="right">January to April, 1923.</div>

Gas sales revenue (actual)..........................$35,976.00
Mdse. and jobbing revenue (estimated as ⁴/₁₂ of 1922)⁶      470.00

$36,446.00

Operating expenses (including retirement reserve at 7
cts. as the Commission estimates but not including any
interest) ...........................................      25,422.00

Operating income .............................      $11.024.00

. $11,024 for four months equals $33,072 per year, slightly less than 9 per cent. per year, upon $375,000. The readjustments claimed by the Utility would bring this down 2 or 3 per cent.

[16, 17] It is well settled that the court cannot fix the rate, directly or indirectly, but is concerned only with whether the Commission rate is confiscatory. If so, an injunction must issue. While this is the general rule, yet if it appeared that the rate, which the Utility was receiving and after taking into account any equitable right to amortize recent past losses, was excessive to the point of being above the value of the service and above any reasonable maximum, we should not hesitate to make the granting of an injunction conditional upon a suitable voluntary abatement by the Utility. The Toledo Case, supra, 259 Fed. at page 458; The Consolidated Gas Case, 258 U. S. at page 177, 42 Sup. Ct. 264, 66 L. Ed. 538; Id. (D. C.) 267 Fed. at page 273. However, we cannot regard a return which, upon the Commission's figures, is less than 9 per cent., and which, after deciding matters of dispute, may turn out to be not more than 6 per cent., as so excessive as to require the application of this rule of voluntary abatement.

[18] We understand that under the Michigan law, the Utility and the municipality must join in an appeal to the Commission in order to give the jurisdiction. If this is still the situation, it might be claimed that the Commission's jurisdiction was ended by the order which it made, and against which this motion is directed. We do not so regard it. We think the effect of the injunction now ordered is to leave the matter open before the Commission as if its final order had not been made, and that it is fully at liberty to proceed with the hearing, upon its own initiative, giving the Utility suitable opportunity to be heard upon proofs and arguments, and then to make its further final order, without any embarrassment by the injunction now to issue, excepting as by the direct effect thereof.

If the Commission desires review by the appellate court of any matter involved, it may have such review upon the present record in its present form, or perfected as above suggested, or it may postpone such review until it has taken such further evidence and made such further order as it may desire, and there has been another hearing upon another similar motion for injunction, if such motion should be made.

[19] The amount involved, as between the interim rate and the rate now enjoined, is about $1,000 per month. The Commission has not

⁶ We include this item without any implication as to its propriety.

indicated that it regards a bond as material to the protection of the consumers; but we are inclined to think that under section 18 of the Clayton Act (38 Stat. 738; U. S. C. S. § 1243b), the court on its own motion should require such bond, unless the defendant waives it. The penalty of the bond will be $25,000, and the condition will be that the bond will be void if it be ultimately determined that the Commission's fixed rate of $1.54 was a lawful rate and should have been paid, and if then the Utility refund the excess to each consumer; and that, in such event, the amounts of refund and the persons entitled be fixed (at the request of the Commission) by an accounting in this court, of which accounting all taxable costs and expenses shall be paid by the Utility.

[20] This memorandum being on file, bearing the signatures of the three judges, and thus evidencing the consent and approval required by section 266, we think it proper for the local district judge, acting alone, to approve the bond and thereupon to issue the preliminary injunction prayed for.